No. 54,911

IN THE MATTER OF THE ADOPTION OF BABY BOY IRONS

ANJANETTE IRONS, *Appellant,* v. BRUCE LIEBERMAN and SUSAN LIE-BERMAN, *Appellees.*

(684 P.2d 332)

Opinion filed June 8, 1984.

*John H. Fields,* of Carson, Fields, Boal, Jeserich· & Asner, of Kansas City, Kansas, was on the brief for the appellant.

*John C. Amorosa,* of Mission, was on the brief for the appellees.

The opinion of the court was delivered by

HERD, J.: This is an appeal from an order of adoption. Baby Boy Irons was born at 5:21 a.m., April 22, 1982, at Bethany Medical Center, in Kansas City, Kansas. Later that day the infant's unwed, eighteen-year-old mother, Anjanette Irons, signed a written consent to the adoption of the baby and waived notice of hearing. The consent was acknowledged before a notary public.

At 10:20 a.m. the following day, a petition seeking adoption was filed in the district court of Johnson County, Kansas, along with the written consent. On May 12, 1982, the appellant contested the adoption alleging her consent was not freely and voluntarily given. The trial court ruled against Ms. Irons.

Appellant learned she was pregnant when she went to Dr. Alvin Silvers on October 7, 1981. After conducting a brief physical examination of appellant, Dr. Silvers confirmed her pregnancy and asked what she was going to do with the baby. Anjanette said she was going to keep the child. Dr. Silvers told her considering her age and economic condition she should put the baby. up for adoption or have an abortion. Anjanette was seventeen at the time. He also told her he did not perform abortions. Dr. Silvers testified he gives this advice to all unwed, pregnant patients who lack financial resources.

Anjanette Irons' father and mother were divorced when Anjanette was quite young. Though her father lived within forty miles of Kansas City, she seldom saw him. She and her mother, Loretta Hernandez, had a history of conflict. Anjanette had made her home with Martha Donnelley for the past year or so, going home on weekends. She was employed at a nursing home where she made $3.60 per hour.

Some eighteen months prior to her pregnancy appellant started dating Steve Lewis. She dated no one else. She and Steve had sexual relations regularly during that time. Steve was in the military service with orders to go to Korea in the summer of 1981. He professed love for Ms. Irons and discussed marriage to her with her and her mother in July before leaving. Ms. Hernandez discouraged the marriage because of Lewis's imminent departure for a lengthy period. She was not aware of her daughter's pregnancy at the time. Appellant wrote Steve in Korea and told

him of her pregnancy. He acknowledged his paternity in a letter to her.

Ms. Irons visited Dr. Silvers each month after her original visit in October until the baby was born. On each visit prior to February, 1982, Dr. Silvers continued to advise her she should give up her baby for adoption. After each discussion, appellant advised the doctor she was going to keep her baby.

At the February visit with Dr. Silvers, Ms. Irons reported she had received a valentine from Steve Lewis but he had not mentioned her pregnancy. She also reported she had quit her job and had no income. After the examination, Dr. Silvers talked to appellant and asked her if she had changed her mind about keeping the baby. She reluctantly stated she thought adoption was her only option. After that, Dr. Silvers suggested appellant talk to his daughter, Lori Klarfeld, an attorney who handled adoptions. That evening Ms. Irons called Ms. Klarfeld and arranged a meeting.

The meeting between appellant and Ms. Klarfeld occurred on March 10, 1982, in Dr. Silvers' office. At that meeting Ms. Klarfeld discussed the adoption procedure with appellant. Klarfeld also told her she was not appellant's attorney but represented the couple who wanted to adopt the baby. Appellant told Ms. Klarfeld she believed adoption was best for the baby. She mentioned she had grown up without a father, and believed a child should have two loving, capable parents. Ms. Klarfeld took a medical and family history from Anjanette Irons. She told her she had a Jewish family picked out to adopt the baby. Appellant told Ms. Klarfeld she preferred a Catholic family. Ms. Klarfeld responded she was not sure she could arrange that but she would see what she could do. At the conclusion of their discussion, Ms. Klarfeld also said, "I think you have made the right decision, Anjanette, for both the baby and you."

Appellant and Ms. Klarfeld did not meet again until April 22, 1982, after the birth of the baby. Appellant, however, telephoned Ms. Klarfeld on April 4. The purpose of this phone call was to inform Ms. Klarfeld appellant was not going through with adopting her baby to a New York couple. Ms. Klarfeld and Dr. Silvers had heard appellant was considering such adoption. Appellant told Ms. Klarfeld she had contacted a New York couple as the result of an advertisement she saw in the newspa-

per but she did not care for the New York family, and therefore had abandoned the idea.

Appellant was admitted to Bethany Medical Center on the morning of April 22, 1982, at 3:40 a.m. The birth of the child occurred at 5:21 a.m. with Dr. Silvers as attending physician. At about 10:30 a.m. that morning, appellant requested to see the baby but the nurse told her she could not see him because he was awarded to the court.

Appellant did not notify attorney Klarfeld when she entered the hospital, but Ms. Klarfeld called on appellant in her room at about 11:00 a.m. Ms. Klarfeld had received a call from her father, Dr. Silvers, telling her the baby had been born. Ms. Klarfeld told appellant she had a Catholic family for appellant's child. Ms. Klarfeld placed the consent papers on the bedstand and told appellant they had to wait for a notary. Ms. Klarfeld did not read the consent document to appellant, but she reviewed it with her. Appellant did not read it herself. She testified however, she understood it was the consent to give her baby up for adoption. She later stated she signed the consent so she could see her baby. According to both the notary and Ms. Klarfeld, appellant looked well, had no trouble signing the document and did not question what she was doing. Ms. Klarfeld did not tell appellant that signing the papers was an irrevocable act, but appellant understood the document was a consent to adoption. Shortly after Ms. Klarfeld left with the executed instruments the nurses allowed appellant to see the child. She saw the baby one other time that afternoon. She was not allowed to see the child again.

The afternoon of the birth, appellant's sister, who did not know appellant was thinking of adoption, came to the hospital and brought a stuffed animal. Appellant tearfully told her she had given the baby up. On the afternoon of April 23, 1982, Ms. Klarfeld obtained an affidavit from appellant to prove the paternity of the baby. Appellant was released from the hospital on the morning of April 24, 1982.

On Sunday afternoon, April 25, 1982, appellant telephoned Ms. Klarfeld and told her she wanted her child back. Appellant said that if she did not receive her child back she would go to the district attorney. Appellant then hung up. Ms. Klarfeld called appellant Monday morning and asked appellant to come to her office that day. Appellant testified Ms. Klarfeld told her to bring

clothes for the baby if she was going to take it home with her. Appellant purchased clothes and went to Ms. Klarfeld's office with her sister and a girlfriend at about 10:00 a.m. expecting to get the baby. Ms. Klarfeld informed appellant her clients would not relinquish the baby and she would have to find herself another attorney.

Appellant views herself as easily influenced and believes she was unduly influenced by Dr. Silvers to further his daughter's career. Dr. Silvers was the only individual with whom appellant discussed her options concerning the birth of her child. Her mother, Steve Lewis's mother, and her female friends were not consulted.

Loretta Hernandez, appellant's mother, testified that during appellant's pregnancy she mentioned giving up her child for adoption a few times, the first time being in February. Although Ms. Hernandez did not believe her daughter would give up her baby, they never discussed the matter.

On the evening of April 22, 1982, when Ms. Hernandez learned appellant had signed the consent papers, she was shocked. Ms. Hernandez testified she was upset but did not say anything about it to appellant. On Friday, April 24, 1982, Ms. Hernandez telephoned Ms. Klarfeld. Ms. Hernandez testified she asked Ms. Klarfeld to give the baby back. Ms. Klarfeld testified Ms. Hernandez called only to inquire about being reimbursed for the hospital expenses.

Several of appellant's friends testified the length of time Dr. Silvers talked to the appellant at each of her monthly visits ranged from forty minutes to an hour and a half. Other testimony indicated the discussions were much shorter.

The trial court found there was no evidence of undue influence by either Dr. Silvers or Lori Klarfeld. Further, it found appellant failed to meet her burden of proof to show her consent to the adoption was not freely and voluntarily given.

The appellant argues the trial court erred in ruling on evidentiary questions. Initially, testimony alleged to be immaterial was admitted. The testimony was that of an unwed, forty-one-year old mother of four. She told the court she had been a patient of Dr. Silvers' when she was pregnant. Dr. Silvers had advised her to give up her child for adoption due to her status as an unwed mother. The witness testified she had not felt unduly pressured

by Dr. Silvers and chose to keep her child. The evidence was material and was properly admitted.

The appellant argues two points of error concerning the testimony of Dr. Kresser. Dr. Kresser is a counseling psychologist who saw appellant at the request of appellant's counsel approximately a week before trial. Dr. Kresser tested appellant and consulted with her.

First, appellant alleges the court erred in refusing to permit Dr. Kresser to testify as to whether appellant's consent was freely and voluntarily given. When evidence is excluded by the trial court, we have held, "One seeking reversal of a judgment because of exclusion of evidence has the burden of demonstrating prejudice as well as error in the ruling complained of." *Atkins v. Bayer*, 204 Kan. 509, 511, 464 P.2d 233 (1970). The appellant does not indicate what Dr. Kresser's testimony would be on this point. This is a failure to demonstrate prejudice, since it is unknown what effect the response might have had on the evidence and judgment. The exclusion of Dr. Kresser's testimony, therefore, did not constitute error.

The appellant also argues the trial court erred since its findings reflect it rejected Dr. Kresser's testimony that appellant had never made a final decision about the adoption. A factfinder need not accept, without question, an expert's testimony. The opinion testimony of an expert is to be considered as any other testimony and should receive such weight and credit as the factfinder decides to give it. See *Plains Transp. of Kan., Inc. v. King*, 224 Kan. 17, 21, 578 P.2d 1095 (1978), and PIK Civ. 2d 2.50. It is not error for the factfinder to disregard opinion testimony of an expert. The trial court's finding here reflects a legally correct evaluation of all the evidence presented.

Appellant concludes by contending the trial court erred in refusing to permit the examination of Lori Klarfeld concerning the amount of her attorney fee. Ms. Klarfeld admitted she was being paid in this matter and that her minimum fee in adoption cases is $1000. The appellant wanted to know exactly how much she was making in this case in order to infer her fee affected her credibility as a witness. The trial judge ruled that such testimony was immaterial and irrelevant. The existence of a fee, which was allowed, showed there might be financial considerations tainting Ms. Klarfeld's testimony. The exact amount of the fee in no way

tends to prove any material fact and is, as the trial court held, irrelevant and immaterial.

The appellant next argues it was error to place the burden of proof on the appellant to prove her consent to the adoption was not freely and voluntarily given. K.S.A. 59-2102(c) pertains to the consent required from the natural mother for the adoption of her child. It provides:

"If consent has been given in writing and has been filed of record in the district court, the consent may be revoked, but only if, prior to final decree of adoption, the consenting party alleges and proves that the consent was not freely and voluntarily given. The burden of proving that the consent was not freely and voluntarily given shall rest with the consenting party."

The legislative intent evidenced in the law reflects a strong public policy to stabilize adoptions and prevent revocation of consent of the mother on a mere whim. This court has recognized when the consent is properly acknowledged as it was here, "[t]he acknowledgement serves as *prima facie* proof of the validity of the consent, and  .  .  .  that the written consent was freely and voluntarily given." *In re Adoption of Trent,* 229 Kan. 224, 228, 624 P.2d 433 (1981).

In order to rebut the presumption of validity there must be a showing of fraud, duress, undue influence, mistake or lack of understanding. See *In re Adoption of Chance,* 4 Kan. App. 2d 576, 583, 609 P.2d 232 (1980), and 1 Elrod, Kansas Family Law Handbook § 6.17(5)(a) (1983). The mere assertion of undue influence, however, is not sufficient to shift the burden of proof. The existence of such influence must be proved by the one asserting it. See 25 Am. Jur. 2d, Duress and Undue Influence § 43.

In her efforts to prove undue influence the appellant contends Dr. Silvers and his daughter, Lori Klarfeld, were both in confidential relationships with the appellant, one as her doctor, the other as her lawyer. This court has held a presumption of undue influence is not raised and the burden of proof is not shifted by the mere fact that an individual occupies a confidential or fiduciary relation with another. Such a presumption is raised and the burden of proof shifted, however, when, in addition to the confidential relation, there exist suspicious circumstances. See *In re Estate of Brown,* 230 Kan. 726, 732, 640 P.2d 1250 (1982).

The question then is whether there was sufficient proof, not

only of the existence of a confidential relationship but also whether there was sufficient proof of suspicious circumstances surrounding either Lori Klarfeld's position as an attorney in this situation or Dr. Silvers' position as the appellant's doctor, to shift the burden of proof.

We will first consider the allegation of a confidential relationship between Dr. Silvers and appellant. The rules pertaining to the relationship of doctor and patient are explained as follows:

"A person in ill health is more subject to the domination and undue influence of another than is a person of sound body and mind. The physician naturally is in a position of trust and confidence as regards the patient, and his opportunities to influence the patient are unusual. Hence all transactions between physician and patient are closely scrutinized by the courts, which must be assured of the fairness of those dealings." 61 Am. Jur. 2d, Physicians, Surgeons, Etc. § 168, p. 299.

Due to the position of trust and confidence between Dr. Silvers and appellant, as evidenced by her acceptance of his advice regarding the adoption of her baby, we find Dr. Silvers held a confidential relationship with Anjanette Irons.

The relationship of Lori Klarfeld and Anjanette Irons is more complicated and requires careful scrutiny. It has been stated:

"The authority of an attorney begins with his retainer; but the relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession." 7 Am. Jur. 2d, Attorneys at Law § 118, pp. 187-88.

See also *Caldwell v. Bigger,* 76 Kan. 49, Syl. ¶ 4, 90 Pac. 1095 (1907).

As previously indicated, Ms. Klarfeld was contacted by Anjanette Irons at the suggestion of Dr. Silvers for the specific purpose of discussing the legal aspects of adoption. They met in Dr. Silvers' office on March 10, 1982. Anjanette was merely eighteen years of age and was not represented by other counsel. At the meeting, attorney Klarfeld advised Ms. Irons about adoption. She also told Ms. Irons she was not her attorney but was attorney for the adoptive parents. As it turned out, Klarfeld did not have a client. A couple had previously discussed adoption with her, but when she contacted them about adopting Ms. Irons' baby they advised Ms. Klarfeld they had already adopted a child. Anjanette

Irons and Lori Klarfeld subsequently had a telephone conversation and one additional meeting about the adoption. The second meeting was in the hospital, a few hours after the birth of the baby on April 22. Ms. Klarfeld had been notified by her father that Ms. Irons had given birth. Ms. Klarfeld prepared a consent to adoption and a waiver of notice and brought them to the hospital for Anjanette's signature. At this time, Anjanette was still not represented by other counsel. In the meantime, Ms. Klarfeld had been employed by the adoptive parents, Bruce and Susan Lieberman. Ms. Klarfeld explained the content of the consent and waiver to Ms. Irons. Ms. Irons then signed the documents.

Taking into consideration all the circumstances of this case—Anjanette's age, her lack of experience and her contacts with Ms. Klarfeld—we find an attorney-client relationship existed between them. The only reason Anjanette contacted Ms. Klarfeld was to seek legal advice. In adoption cases, such as this, the attorney can represent both the natural and adoptive parents. The attorney owes both sets of parents a duty to provide good faith advice concerning the legal consequences of their acts. This multiple representation can continue so long as no conflict develops between the parties. However, if a conflict occurs, the attorney must choose which conflicting interest he or she will represent. The best way to apprise the parties of the choice is by use of a frank discussion before representation commences, as was done by Ms. Klarfeld. Since Lori Klarfeld's relationship with Anjanette Irons was confidential, she owed Anjanette the duty of complete legal advice concerning the nature and consequences of adoption.

As previously noted, in order to shift the burden of proof away from the appellant, it is not enough that the confidential relationship alone is proven. Suspicious circumstances must also be shown to exist. In this case, the mere existence of the family relationship between appellant's doctor and attorney was suspicious enough to require the burden of proof to shift. The trial court, therefore, erred in ruling the burden of proof was upon appellant, Anjanette Irons. The separate question is whether this error warrants reversal. We have often held if the judgment of the trial court is correct it is to be upheld even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision. *Taylor v. Department of Health & Envi-*

*ronment,* 230 Kan. 283, 286, 634 P.2d 1075 (1981). Appellant cites *Quinton v. Kendall,* 122 Kan. 814, 253 Pac. 600 (1927), as authority for requiring reversal when the erroneous reason used by the trial court involves an incorrect ruling on the burden of proof. *Quinton's* holding does not stand for that proposition. In *Quinton,* the plaintiff lost at the trial level. On appeal, plaintiff argued the trial court erred in placing the burden of proof upon it at trial. This court held the error was immaterial and affirmed the trial court by saying: "Where each party to a lawsuit had a fair opportunity to present all his evidence, the question as to which litigant had the burden of proof is immaterial . . . ." 122 Kan. 814, Syl. ¶ 6.

The argument in *Quinton* is similar to that here. Anjanette Irons, the plaintiff below, argues the burden of proof was improperly placed upon her at trial. While she is right, the error does not necessarily warrant reversal as it would in a jury trial. The record must be examined to determine if the evidence shows appellees sustained the burden of proof which should have been placed upon them at trial. This will be resolved in analysis of the next issue, where appellant attacks the sufficiency of the evidence to support the trial court's finding that the consent to the adoption was freely and voluntarily given. In accordance with K.S.A. 59-2102(c), the revocation of a consent to adoption is allowed only when it is proven the consent was not freely and voluntarily given.

It is imperative to note this court's scope of review when determining the sufficiency of the evidence. The Court of Appeals in a previous adoption case articulated these rules. See *In re Adoption of Chance,* 4 Kan. App. 2d 576, 583, where the court stated:

"Whether a consent to adoption was freely and voluntarily given or was tainted by . . . undue influence . . . necessarily depends on the facts and circumstances of each case. As such, these issues are to be determined by the trier of fact who has the best opportunity to weigh the evidence and test the credibility of witnesses. . . . It is not the function of this court to weigh conflicting evidence or redetermine questions of fact and our only concern is with evidence which supports the trial court's findings and not with evidence which might have supported contrary findings."

The evidence in this case showed the appellant had many months to consider her options. She had no source of income at the time of the birth. Her contact with the father of the child had

been sporadic and only once had he acknowledged the child was his. The adoption procedure was thoroughly explained to her by Ms. Klarfeld. Ms. Irons made an effort on her own to seek a couple for adoption in New York. After the baby was born, Ms. Klarfeld prepared the adoption papers. When she called upon Anjanette at the hospital she explained the meaning of the consent and the waiver. Anjanette expressed no misgivings about giving up the child when she signed the consent form. After the signing, Ms. Irons told a nurse she thought she had done the right thing. According to the witnesses, there was no appearance of coercion or misunderstanding.

As to Dr. Silvers' role, he encouraged the appellant to have her baby adopted because he felt it would be best for her and the baby. Dr. Silvers testified he always encouraged adoption for unwed mothers who had no financial support, since, from his experience, this was the best option for both the natural mother and baby. The appellant did not have a job or a home and was young and unwed. Three former patients in similar situations testified Dr. Silvers had given them the same advice. Two considered his advice, but kept their babies anyway. One testified she met with Dr. Silvers only one and then discontinued her visits because he had asserted too much pressure on her to have her baby adopted. All three were patients of Dr. Silvers after his daughter, Lori Klarfeld, commenced practicing law. Anjanette Irons was free to seek medical services from another physician if she felt unduly pressured to have her baby adopted. She was also free to seek advice from family and friends.

Dr. Silvers was not present when appellant signed the consent document and hence could not have exerted undue influence at the time on his patient. It is argued by appellant that she was forced into signing the consent by the withholding of her baby from her until she signed the consent. The evidence does not support her argument. Anjanette took nearly five months to make up her mind to go through with the adoption. From the February meeting with Dr. Silvers until the birth date, she did not waver in her resolve. Under the facts of this case, Dr. Silvers was justified in telling the nurses the baby was up for adoption because it was the truth. Also, knowing human nature, he knew it would be less painful for Anjanette if she did not see the child, hence the ban on Ms. Irons' seeing the baby. There was some

evidence the withholding of the baby from Ms. Irons was for the purpose of forcing her to sign a consent to adoption. On the other hand, there was testimony it was for the humanitarian reason of protecting Anjanette from a painful experience. The trial court found the latter to be true. On appeal we will not disturb the findings of fact of a trial court if they are supported by substantial competent evidence.

The only evidence that the appellant's consent was not freely and voluntarily given occurred several days after she signed the consent documents. The legislature has provided that only the will of the parent at the time of the giving of the consent will be considered in an adoption contest.

This legislation was enacted in 1968, when the Kansas legislature adopted a new law which provided a natural mother no longer had an opportunity to revoke her consent before the final order of adoption was entered. The new legislation was in response to the realities of the adoption situation. Speaking on the change, it was stated: "Consent to an adoption should not be treated as a typical contract question, but both the adopting parties and the child have legitimate expectations once the adoption process has begun. The natural parents should not be able to upset these expectations at whim." Berenson, *Survey of Kansas Law: Family Law,* 17 Kan. L. Rev. 349, 353 (1969).

The evidence indicates Anjanette Irons changed her mind more on this disallowed "whim" than after the thoughtful consideration required by the new law. Appellant argues this law is too harsh and that "[t]rial courts must fill the breach left by the legislature by carefully scrutinizing all such transactions." It is not for courts to change public policy which was clearly and unambiguously expressed by the legislature. In discussing a change in adoption laws much like the changes by the Kansas legislature, the Illinois Appellate Court discussed the purpose of such laws.

"Admittedly, a mother's decision to consent to her child's adoption by a couple to her unknown must be a most difficult one to make. Strong emotional factors militate against it. Once done, misgivings not only may occur, but are probable, and it is not unlikely that attempts to rescind such consent will be made at a time when the child has been placed in an adoptive home, and new attachments formed. The complex psychological problems inherent in situations resulting from the former procedure permitting a natural parent to withdraw a consent at any time prior to actual entry of the order of adoption [citation omitted] with its

resulting environmental instabilities for the child, were resolved in recent years by legislative action [citation omitted] making such consent irrevocable in the absence of fraud or duress even in instances where the consenting parent is a minor. This clear expression of public policy may not be restricted by us, and where the evidence indicates no fraud or duress was present, the consent must be held effective." *Peo. ex rel. Drury v. Cath. Home Bureau,* 34 Ill. 2d 84, 93-94, 213 N.E.2d 507 (1966).

The change in Kansas law was based on the same considerations. This is not a "breach left by the legislature" as appellant contends, but a purposeful, necessary change. The trial court here carefully scrutinized the evidence, but the law no longer favors revocation by natural mothers. The cases cited by appellant from other jurisdictions which are to the contrary are unpersuasive.

Even though we have the utmost sympathy for the anguish of Anjanette Irons, we have no hesitation in holding appellees sustained their burden of proof. This was a trial to the court. The parties introduced all the evidence they had. The order of events did not affect the result since the court had available to it all the evidence, virtually all of which was uncontested. Thus, the resolution of this controversy was primarily that of weighing the evidence. We think the answer is clear and accordingly hold that Anjanette Irons freely, knowingly and voluntarily gave her consent to the adoption of Baby Boy Irons.

The judgment of the trial court is affirmed.

HOLMES and McFARLAND, JJ., concur in the result.

SCHROEDER, C.J., dissenting: In my opinion, due to the involvement of Lori Silvers Klarfeld and Dr. Alvin Silvers, the appellees failed to sustain the burden of proof cast upon them to show the consent of Anjanette Irons, the appellant, was freely and voluntarily given.

The majority opinion holds both Dr. Silvers and his daughter, Lori Klarfeld, were in a confidential relationship with the appellant, one as her doctor, the other as her lawyer. In addition, the majority finds suspicious circumstances existed due to the existence of the father-daughter relationship between the appellant's doctor and her attorney. Therefore, a presumption of undue influence arose and the burden of proof shifted to the appellees to show the appellant's consent to the adoption was freely and voluntarily given. With these findings and conclusion

I agree. However, a review of the evidence presented, by Silvers and Klarfeld particulary, discloses it fails to overcome this presumption.

Competent and sufficient evidence must be presented to rebut a presumption of undue influence. In 25 Am. Jur. 2d, *Duress and Undue Influence* § 46, it is stated:

"As a general rule, to render [a transaction between those in a confidential or fiduciary relationship] valid, it is necessary to show only that the party alleged to have been influenced had competent and disinterested advice, or that he performed the act or entered into the transaction voluntarily, deliberately, and advisedly, knowing its nature and effect, and that his consent was not obtained by reason of the power and influence to which the relation might be supposed to give rise. Moreover, it has been held that the presumption may be rebutted by proof that the parties dealt as strangers and that no unfairness was used, that the facts in the knowledge of the one in the superior position affecting the matter were communicated to the other, or that the entire transaction was made in perfect good faith and was equitable and just."

The test of undue influence is whether the party alleged to have been influenced exercised his own free agency and acted voluntarily by the use of his own reason and judgment, which is to be determined by the surrounding circumstances, including the relation of the parties, the time and manner of making suggestions or giving advice, the motive, if any, in making suggestions, and the effect upon the party so acting. See *Cersovsky v. Cersovsky*, 201 Kan. 463, 467, 441 P.2d 829 (1968); *In re Estate of Ziegelmeier*, 224 Kan. 617, Syl. ¶ 2, 585 P.2d 974 (1978). It is generally held there are four elements of undue influence: (1) a person who is subject to influence, (2) an opportunity to exert undue influence, (3) a disposition to exert undue influence, and (4) a result indicating undue influence. 25 Am. Jur. 2d, *Duress and Undue Influence* § 36. Factors to take into consideration to determine the existence of undue influence include the age and physical and mental condition of the one alleged to have been influenced, whether the person had independent or disinterested advice in the transaction, the providence or improvidence of the gift or transaction, delay in making it known, necessities and distress of the person alleged to have been influenced, the person's predisposition to make the transfer in question, and active solicitations and persuasions by the one benefitting from the transaction. See 25 Am. Jur. 2d, *Duress and Undue Influence* §§ 36, 48.

Each of these factors is established by uncontroverted evidence in the record or by the trial court's own findings of fact and conclusions of law. The trial court made these conclusions of law:

"It can be conceded for this case that Anjanette places reliance on the advice and opinions of others and that she is swayed by figures in authority, particularly if male, and further that the decision to give up a child is an extremely emotional and difficult decision, under any circumstances.

"It is true that Anjanette felt, at least up to February 1982, that she would keep her child. Well into the third trimester of the pregnancy, the hard and fast realities of her situation began to become more evident and she began considering adoptive placement and even initiated contacts with residents of New York.

"The day of decision arrived earlier than expected and may have caused more stress on Anjanette than otherwise might have existed."

These conclusions of law, made by the trial court, establish the appellant was a person subject to influence. Clearly she relied on the advice of her doctor and attorney. The appellant was seventeen years old when she began going to Dr. Silvers for prenatal care and had been eighteen for only two months when the child was born. She did not live at home with her mother, but instead lived with a girlfriend until about a month before the birth. She did not discuss the options available to her or receive independent advice from her mother, close friends, social workers or counselors. At the time of the birth she no longer had a job and had no means of support other than welfare. Such circumstances would present a very difficult, stressful situation for any unwed mother, but particularly for a teenager with no support, emotional or financial, from her family or other sources. Unquestionably the appellant was susceptible to the suggestion and advice of her doctor and attorney.

The opportunity for Dr. Silvers to exert undue influence upon the appellant was clearly present and the evidence indicates he took every advantage of that opportunity. Dr. Silvers himself understood that his patients place a great deal of reliance on him. He used that position of trust and reliance to persuade Anjanette to put her child up for adoption, whether she wanted to or not. When Anjanette informed him she intended to keep her baby, she was subjected to what amounts to an intense campaign designed to convince her to give up her baby for adoption. At every prenatal visit she was subjected to unsolicited "advice" to have the child adopted. Dr. Silvers told her she was a "complete

fool" if she kept the baby. At every visit Dr. Silvers would continue to point out to the appellant that she could not properly support the child and would get "nowhere in life" if she kept the baby. At a time when the appellant felt she had no options left to her because she no longer had a job and had not heard from the father, Dr. Silvers suggested she should contact *his daughter*, Lori Klarfeld, an attorney, to handle the legal details of the adoption.

The testimony of Dr. Silvers and others clearly shows he had a disposition to exert undue influence. The trial court made this pertinent finding of fact:

"Throughout the trial of this matter, Dr. Silvers' expressions of advice to Anjanette about her alternatives in dealing with the child have been the subject of protracted testimony. Several witnesses have testified that Dr. Silvers gave the same advice to them and they chose not to follow that advice. Dr. Silvers' own testimony reveals that he is strongly of the opinion that the best interest of the mother and child are to adopt the child out. That he gave that advice to Anjanette, on several of the pre-natal visits, is undisputed."

The fact that other witnesses testified they were not persuaded against their will by Dr. Silvers' advice is immaterial here. We must look subjectively at the *appellant's mental condition* and the circumstances and stress affecting her at the time she was alleged to have been influenced, which may have caused Dr. Silvers' influence to be greater upon her than other patients.

Dr. Silvers' personal interest in influencing the appellant was established by his own testimony at trial. He testified he has an interest in furthering his daughter's career and assumes if he can supply her with a baby for adoption she will profit from it. Although Dr. Silvers professed concern at trial for the welfare of his patients and their unborn children, it becomes evident when viewing all the evidence presented that his primary concern was not for Anjanette's personal happiness or to ensure that adoption was truly her choice, but to impose his personal beliefs concerning the welfare of unwed mothers and their children upon his patients and to assist in furthering his daughter's career, if possible, by supplying her with babies for adoption.

A conclusion of undue influence is inescapable when one views the circumstances surrounding Anjanette's signing of the consent form in the hospital. It is undisputed that Dr. Silvers instructed the hospital staff not to let anyone see the baby until Anjanette had seen "the lawyer." Dr. Silvers testified he knows a

mother is more likely to sign a consent to adopt if she hasn't seen the baby. Without consulting Anjanette or being asked by her to do so, Dr. Silvers telephoned his daughter shortly after the baby was born and advised her of the birth. Uninvited by the appellant, Lori Klarfeld appeared in Anjanette's hospital room, with the consent documents in hand, less than six hours after Anjanette, an unwed eighteen-year-old, had delivered her first child. Anjanette had not yet had an opportunity to visit with any member of her family. She had been informed she could not see the baby because it was a ward of the court. She testified she believed that by signing the consent form she would be allowed to see her baby. Although she knew she was signing a consent for her baby to be adopted, she did not understand it was irreversible. The following testimony of Lori Klarfeld reflects the manner in which the legal ramifications and irrevocable nature of the consent document were explained to Anjanette:

"Q. Did you tell her that when she signed that consent that she had irrevocably and irretrievably given up the right to her child?

"A. I'm not sure I expressed it that way. That she would be signing a consent and that was —

"Q. You told her she was signing a consent to adopt, right?

"A. Yes.

"Q. Did you explain to her that the statute of this state requires that in the event she should change her mind for any reason whatsoever that the only way she could upset that signed consent was to be able to establish that the consent was not freely and voluntarily given, did you explain that to her?

"A. I doubt that I used those terms, no. But I'm sure that I told her her consent was irrevocable. I doubt I used that particular term.

"Q. You didn't explain to her what the statute would require her to do in case she wanted to change this consent?

"A. No, because there was no suggestion that she wanted to change her consent.

"Q. So you didn't feel it was necessary to explain to her what the statute was because you weren't representing her?

"A. I explained to her she was signing a consent to an adoption and it was a final proceeding or that her signature was final. I did not say the statute says this or that it was irrevocable, in those terms, no.

. . . .

"Q. And you assumed she understood this was an irrevocable act?

"A. Yes.

"Q. And you assumed that she understood what the law was in that regard?

"A. We didn't talk about the law per se.

"Q. Don't you feel that when you talk to her as you did, under the circumstances you did, being referred to her by your father, meeting with her in your

father's office, that you owed an obligation to explain the full extent and purport of the law?

"A. *I explained to Anjanette that I represented the adopting couple and if she had any problem about working with me she could get another lawyer.*

. . . .

"Q. Well, you didn't explain what the law said about what it took to set aside a consent, you didn't explain that to her?

"A. There wasn't any question about her setting aside a consent.

"Q. Okay. But you didn't explain it to her, did you?

"A. No." (Emphasis added.)

These facts, taken together, constitute nothing less than coercion and duress on the part of Dr. Silvers and Lori Silvers Klarfeld when the appellant was in a position where she was extremely vulnerable, both emotionally and physically. This type of behavior on the part of a patient's doctor and lawyer should not be approved merely because the patient succumbs to their influence. In other cases courts have found a mother's consent to adopt was not freely and voluntarily given where undue influence has been exerted by the mother's physician or another professional. See, *e.g.,* Annot., What Constitutes Undue Influence in Obtaining a Parent's Consent to Adoption of Child, 50 A.L.R.3d 918 § 7. In *D— P— v. Social Service & Child W. Dept.,* 19 Utah 2d 311, 431 P.2d 547 (1967), it was held that under the totality of the circumstances a 34-year-old unwed mother was unduly influenced to give up her child for adoption, where during her pregnancy she had been repeatedly advised by her doctor-brother, attending physician and a social worker with a placement agency to give up her child. Within 24 hours of delivery by Caesarian section which followed extensive pain, and within a few hours after the mother received pain relievers, the social worker appeared with the consent form which the mother signed. All the witnesses who testified conceded the mother was upset and crying, and that it was an ordeal for her. Twelve days later the mother sought to revoke her consent. In ordering the return of the child to the mother the court recognized the rule, that the weight and credibility of the evidence is for the trial court to consider, should not be followed where the reviewing court was convinced that under the facts of the case equity required reversal of the trial court. 19 Utah 2d at 321. The court also made this comment:

"[M]ost everyone will agree that there is a strong presumption . . . that a pregnancy experienced by a single woman generally is fraught with emotional

upset, fear of social consequences, economic problems and unusual reactions that make a woman under such circumstances subject to unusual pressures." 19 Utah 2d at 312.

Other factors are also present in the instant case indicating Anjanette's consent to adopt was not freely and voluntarily given. Both Anjanette's mother and sister were shocked to learn, after the fact, that Anjanette had consented to adoption. Anjanette remained very emotional and cried throughout the remainder of her stay in the hospital. The day after her discharge from the hospital Anjanette telephoned Lori Klarfeld and advised her she wanted her child back. Anjanette's mother also sought the return of the baby. Anjanette and her mother were then advised to seek the advice of an attorney.

From the totality of the attendant circumstances involved in this case it can only be concluded that Anjanette Irons' consent to adopt was not freely and voluntarily given, but was obtained as the direct result of undue influence exerted over her, by Dr. Silvers and his daughter, Lori Klarfeld, prior to and after the delivery. The factors cited in the majority opinion in support of the trial court's finding that the appellant's consent was freely and voluntarily given are insufficient to overcome the presumption of undue influence raised under the circumstances of the case. The fact that Dr. Silvers personally believed the mother and child would be better off if the child was adopted out or had humanitarian reasons for not allowing her to see the baby until she had talked to his daughter does not remove the influence which his acts had on the appellant's decision. The majority opinion states Dr. Silvers could not have exerted undue influence over the appellant when she signed the consent document because he was not present at the time. This statement ignores the fact that a great deal of influence by Dr. Silvers occurred prior to that time. Dr. Silvers' influence was also present at the time the consent document was signed by virtue of the fact that he had instructed the hospital staff that she could not see the baby until after she talked to Ms. Klarfeld. This led her to believe, rightly or wrongly, that she had to sign the consent form to see the child. The majority opinion also emphasizes the appellant had several months to make the decision and could have sought advice from others if she had wanted to. Whether she *could have* sought advice from someone other than Dr.

Silvers is, again, immaterial. The fact is, for whatever reason, she did not have the benefit of independent advice from a disinterested objective person. As a result, the advice given to her by Dr. Silvers and Lori Klarfeld acted to influence her all the more. She was told by Ms. Klarfeld she could get another lawyer if she (Anjanette) was not comfortable working with her; however, she was not *advised* that it would be in her best interest to seek the advice of another lawyer, or for that matter, any type of professional counselor.

Concerning the interest of Lori Klarfeld in this case, who stood to benefit most from this transaction, the record discloses these additional facts. Ms. Klarfeld testified her fee for an adoption (to be paid by the adoptive parents) is $1,000 for approximately the first sixteen hours of work she does on the case, and an hourly wage for each additional hour of work required. Ms. Klarfeld has continued to represent the prospective parents throughout this litigation and on appeal even though she was a principal witness in the litigation on the issue of undue influence. Although John C. Amorosa entered his appearance as attorney for the appellees five days after the appellant's defenses to the adoption were filed, Lori Klarfeld has continued to sign her name as attorney for the appellees on various documents found in the court file, entered her appearance as their attorney along with Mr. Amorosa at trial, and has signed motions as attorney for the appellees concerning this appeal filed with the Clerk of the Appellate Courts. Ms. Klarfeld testified Mr. Amorosa is not her law partner but they share the same law office and some legal work. Their practice is referred to as "the law offices of Amorosa and Klarfeld" on the depositions of the witnesses included in the record on appeal. Ms. Klarfeld's conduct in this case is in direct violation of DR 5-102(A) (232 Kan. clxxxv), which requires an attorney to withdraw from the case when it becomes obvious he or she or a lawyer in his or her firm will be called to testify concerning contested matters. See, *e.g., Mildfelt v. Lair*, 221 Kan. 557, 568, 561 P.2d 805 (1977); *State v. Miles*, 191 Kan. 457, 382 P.2d 307 (1963); *State v. Spencer*, 186 Kan. 298, 349 P.2d 920 (1960). It became obvious in this case that Klarfeld would be called as a witness as soon as the appellant's defenses were filed. Klarfeld's failure to withdraw and her continued active participation in the case only serve to emphasize her financial interest in the case, as

well as her lack of objectivity or concern for Anjanette Irons. It is also questionable whether it was proper for Mr. Amorosa to accept employment on behalf of the appellees in view of his close legal association with Lori Klarfeld.

It is respectfully submitted the judgment of the trial court should be reversed and the child returned to the appellant, his natural mother.

PRAGER, J., joins the foregoing dissenting opinion.