NOT DESIGNATED FOR PUBLICATION

Nos. 113,629
113,630

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of: D.R.W.

MEMORANDUM OPINION

Appeal from Phillips District Court; PAULA D. HOFAKER, judge. Opinion filed December 11, 2015. Affirmed.

*Kerry Wasinger*, of Herman Law Office, P.A., of Hays, for appellant, natural mother.

*Melissa M. Schoen*, county attorney, for appellee.

Before MALONE, C.J., BRUNS, J., and ROBERT W. FAIRCHILD, District Court, assigned.

*Per Curiam*: Mother appeals from the district court's finding that she voluntarily relinquished her parental rights as to D.R.W.—who was 2 years old—and I.T.L.M.A.W.—who was 3 years old. On appeal, Mother argues that she did not voluntarily relinquish her parental rights because at the time of the relinquishment hearing she was in poor mental health and she believed that the only way she would be able to see her children was to relinquish her parental rights. However, we find that substantial evidence—which was presented at the relinquishment hearing and at a subsequent hearing to consider Mother's motion to rescind relinquishment—supports the district court's conclusion that the Mother voluntarily relinquished her parental rights. We also find that the district court applied the correct legal standards and that its conclusions of law were legally correct. Thus, we affirm the district court's denial of Mother's motion to withdraw relinquishment.

1

D.R.W. was born to A.H. (Mother) and J.W. (Father) on September 28, 2012, and I.T.L.M.A.W. was born to Mother and Father on October 11, 2011. On January 8, 2013, the State filed a petition alleging that D.R.W. and I.T.L.M.A.W. were children in need of care. The petition claimed that an emergency existed that required out-of-home placement because Mother had been admitted to Larned State Hospital for evaluation and Father was in intensive care because of injuries he had recently sustained to his head.

Attached to the petition was an affidavit from Mike Kramer, a social worker for the Kansas Department for Children and Families (DCF). The affidavit stated that on January 4, 2013, Mother and Father were involved in a conflict, which resulted in Mother driving a vehicle while Father was on the hood of the vehicle. Father was critically injured when he slid off of the hood, and Mother coped with the situation by cutting herself with a razor blade. The affidavit also stated that Mother and Father left the children unsupervised at home during the altercation and that Kramer had previous contact with Father and Mother regarding abuse and neglect of the children.

The following day on January 9, 2013, the district court entered ex parte orders placing the children in DCF custody, assigning a guardian ad litem, and appointing separate attorneys for Mother and Father. On February 25, 2013, Mother and Father entered into an order of continuance and informal supervision after Mother tested positive for and admitted to using methamphetamine and Father refused to submit to a urinalysis test. The order provided that the children were to remain in DCF custody for no longer than 6 months while Mother and Father received treatment.

On July 1, 2013, the district court determined that D.R.W. and I.T.L.M.A.W. were children in need of care because they were without the care or control necessary for their physical, mental, or emotional health. See K.S.A. 2013 Supp. 38-2202(d)(2). In coming

to this conclusion, the district court found that both Mother and Father used a "substantial amount of methamphetamine" and that they had been around their children while under the influence of methamphetamine. Two days later on July 3, 2013, the district court held a disposition hearing, and on July 17, 2013, it entered an order disapproving of the proposed permanency plan. The district court ultimately found that the parties were not making progress toward reintegration, stating that Mother had recently tested positive for drugs; sold a broken down car in her yard for a gram of methamphetamine; and admitted to using cocaine while she was in New York shooting a pornographic video to make money.

On September 26, 2013, the district court appointed Andrew Walter to represent Mother after it had approved a request to terminate her prior counsel. Over the next year, Mother and Father underwent treatment, and the district court conducted several review hearings as well as the requisite permanency hearings. Mother was eventually diagnosed with schizoaffective disorder and borderline personality disorder. During a permanency hearing held on January 8, 2014, the district court reminded Mother that it would not allow unsupervised home visits as long as her three wolf hybrid dogs remained in the home. On June 16, 2014, the district court appointed David Baumgartner to represent Mother, and 4 days later, it approved Walter's withdrawal from the case.

Although it appears that Mother was making progress toward possible reintegration, she eventually decided to relinquish her parental rights to both of her children. Shortly before an October 1, 2014, review hearing, Mother told Baumgartner that she wished to terminate her parental rights. While telling Baumgartner of her wishes, Mother became very upset and started crying. Since this was evidently the first time he had heard that she wanted to terminate her parental rights and Baumgartner was unable to "shake her from that situation," he asked for a 30-day continuance, which the district court granted. Before adjourning, however, the magistrate judge cautioned Mother that relinquishing her parental rights

"is a big, major decision, and so I'm just going to encourage you to really discuss this, all the parties to discuss this, and not wait until the day of the hearing because it is a major decision. So you know, make some appointments, talk with your attorney some more before the next court date, both of you."

Baumgartner told Mother to think it over and to make an appointment to discuss relinquishing her parental rights. At some point between the meetings, Mother called Baumgartner's office, but he was evidently unavailable and she never made an appointment to speak with him. Mother did not meet with Baumgartner until November 3, 2014—the day of a hearing during which the district court acknowledged Mother's written relinquishment. For about half an hour before the hearing, Baumgartner reviewed the form titled "Relinquishment of Minor Child to Agency," which was formulated by the Judicial Council. See K.S.A. 2013 Supp. 38-2268(b)(2); K.S.A. 59-2143. Atop the document is a bolded "NOTICE TO PARENT" that reads: "This is an important legal document and by signing it you are permanently giving up all custody and other parental rights to the child named herein." Moreover, the last provision in the document states that "I have read and understand the above and I am signing it as my free and voluntary act." (http://www.kansasjudicialcouncil.org/183_Relinquishment_MinorChild_Agency.pdf)

During the hearing, the district court reviewed the relinquishment documents with Mother. In doing so, the district court read each provision aloud, and Mother initialed and verbally affirmed that she agreed to each term. After reviewing the document, the district court asked Mother:

"The Court: . . . . So [Mother], I want to make sure I understand then, you have talked to [your attorney] regarding this document, is that correct?

"[Mother]: Yes, ma'am.

4

"The Court: And you'll have to speak up. And have you talked to him on more than one occasion regarding this relinquishment?

"[Mother]: Yes, ma'am.

"The Court: And so this is something that you've thought about, is that correct?

"[Mother]: I have no other choice in this case, Your Honor.

"The Court: Have you thought about it?

"[Mother]: Yes, ma'am.

"The Court: And you've talked to your attorney about it?

"[Mother]: Yes, ma'am.

"The Court: And you are wanting to go ahead and relinquish your parental rights for both children?

"[Mother]: Yes, ma'am."

The district court acknowledged the document and later filed a journal entry in which it stated that it had accepted Mother's relinquishment of rights to D.R.W. and I.T.L.M.A.W. Although the record on appeal contains only Mother's written relinquishment of parental rights in regards to D.R.W., it does not contain the same document for I.T.L.M.A.W. Nevertheless, the transcript of the hearing indicates that the district magistrate acknowledged Mother's relinquishment of I.T.L.M.A.W.

On November 25, 2014, Mother filed a pro se motion to rescind the relinquishment she made during the November 3 hearing. She claimed in her motion that the decision to relinquish her parental rights to her children was the product of a "gross

5

misrepresentation" of her circumstances by DCF, which "intentionally and knowingly misled me, made false promises and took advantage of my mental disability creating within me a dire turmoil that was planned out by this agency in order to cause a mental breakdown leading to the decision of child relinquishment." Shortly thereafter, the district court entered an order permitting Baumgartner to withdraw as counsel for Mother and entered another order appointing Kerry Wasinger to represent her.

On December 8, 2014, Wasinger filed another motion to withdraw Mother's relinquishment, stating that (1) during the hearing on November 3, 2014, Mother "was not in a strong mental state" to relinquish her parental rights; (2) that Mother was pressured by "incomplete evidence and information given to her at that time that this was her only choice"; and (3) that Wasinger was unsure it was appropriate for Baumgartner to initially represent Mother.

In January 2015, the district court conducted a 2-day hearing to consider Mother's motion. Mother testified on her own behalf and called Walter—her original counsel—to testify. D.C.F. called Baumgartner; Jodie Wisdom, a social worker assigned to this case; Julie Wagenblast, the children's foster parent; Francis Townsdin, the children's guardian ad litem; and Brennan Engel, a court-appointed special advocate for the children.

Initially, Mother testified that when she met with her therapist on October 14, 2014, she was "very depressed at that time." She claims that when she met with Baumgartner before the hearing on November 3, 2014, that she "was under the impression that [her and Father] would be allowed to see the children if [they] relinquished rather than be terminated" and that her parental rights were going to be terminated. Mother claimed that Townsdin, Wagenblast, and Wisdom made these impressions. When asked why she did not feel like her decision was made without a clear mind, she responded in part that she "just felt that the world was crashing in on me and I had no hope and I just wanted a chance to see my children." She stated that in August and

6

September 2014—the 2 months before she decided to relinquish—she began taking Valium to help control her anger, which she believed made her depression worsen.

During cross-examination, D.C.F. asked Mother whether her relinquishment was the product of her free will:

"Q. [A]t that time, [the district court] went through those relinquishments with you and asked you multiple times if you were doing this of your own free will and understanding that you were giving up the full power and all the rights of a birth parent, and you said yes.

"A. Well, that's correct. If my children had parents that had more money and would better take care of them, my kids would be happy. They wouldn't, you know, they wouldn't go through anything, you know. We're doing better every day.

"Q. That's not my question, [Mother].

"A. It was my free will and my free understanding, yes. I was under the understanding that that was the only way I could see my children ever again."

On the second day of testimony, Engel—the children's advocate—testified that he and Townsdin met with Mother on September 9, 2014, when she was thinking about relinquishing her parental rights. Engel stated that Mother was frustrated because she was unsure how she could financially afford to raise the children, pay her bills, and pay other child support she owed. He summarized that she thought it was a "lose-lose situation."

In addition, Baumgartner testified about his conversations with Mother before the November 1, 2014, hearing as follows:

"Q. Okay. Do you remember at any time discussing with [Mother] how relinquishment and termination work?

7

"A. Yes.

"Q. Tell me about that.

"A. We talked about that. She was adamant about relinquishing the children. She didn't use that term, but that was what she was talking about was relinquishing the children. I explained that to her. We went over the documents, filled them out, came in here and went over them again with Your Honor, and that was pretty much the end of it. There was no change in her position, she did not want the—she wanted to terminate her rights to the children.

"Q. When you say you went over the forms, would that have then been at the hearing the end of November, the end of October, the first of November?

"A. Correct.

"Q. That would have been the November 3rd hearing?

"A. Yes.

"Q. Okay. How long did you meet with [Mother] that day?

"A. I don't remember. I don't have my time sheets with me, but I would guess from the time that it started until we were in the courtroom was probably a half an hour.

"Q. Okay. So during that time, you said you went over the relinquishment forms?

"A. Correct.

"Q. Tell me about that.

"A. My client appeared to be in a hurry that day. We went over it. We came in here and went over it again with the Court, signed it, and that was basically the end of it.

8

"Q. You said she was in a hurry, but did you go over those forms with her in a detailed manner explaining exactly what a relinquishment is?

"A. We went over each one, and we actually had one signed, but not the (inaudible) until we got in here to court. Explained what the, that this was a final, that this would relinquish her rights to the children, that it would not, that it was voluntary, it wasn't something that was ordered by the Court, it was something she was doing voluntarily. And I told her again that her, reiterated from the earlier hearing that she was doing well, and that St. Francis had said that she was on the uphill way of getting the children back.

"Q. At any time, did you advise [Mother] to proceed to a relinquishment or go in that direction of things?

"A. That was absolutely her choice. It was not mine."

Baumgartner also testified that he believed that he had provided Mother with all of the relevant evidence for her to make an informed decision.

Wisdom—the assigned social worker—testified that during a conversation she had with Mother on September 29, 2014, Mother stated that she could not give up her children because her grandparents would disown her if she did. Wisdom explained to Mother that she could not take away her children but that only the court could make that determination. Wisdom then testified that she explained to Mother that she could not give her any legal advice and told her to discuss relinquishment or termination of parental rights with her attorney.

Wagenblast—the children's foster mother—denied pressuring Mother to relinquish her rights with the hopes that she would be able to adopt the children. Townsdin—the children's guardian ad litem—testified that on September 3, 2014, she was briefly visiting with Mother when Mother asked her what she should do with her children. Townsdin

stated that she refused to give her any advice and she told Mother that she represented her children, so she would have to ask her attorney for advice.

The parties submitted proposed findings of fact and conclusions of law, and on March 26, 2015, the district court entered a detailed order finding that Mother failed to meet her burden to show that her relinquishment of parental rights was not a free and voluntary act. Mother thereafter filed a timely notice of appeal. On May 27, 2015, this court entered an order consolidating the children's cases.

ANALYSIS

*Standard of Review*

The voluntariness of one's relinquishment of parental rights is a mixed question of fact and law. *In re C.D.A.*, No. 111,674, 2014 WL 5801348, at *3 (Kan. App. 2014) (unpublished opinion); *In re C.P.*, No. 109,359, 2014 WL 349616, at *3 (Kan. App. 2014) (unpublished opinion); see *In re Adoption of X.J.A.*, 284 Kan. 853, Syl. ¶ 8, 166 P.3d 396 (2007) (applying the substantial competent evidence standard of review to a district court's findings in regards to the voluntariness of a parent's consent to adopt). Accordingly, in reviewing the issue of whether a parent has voluntarily relinquished his or her rights, we apply a bifurcated standard of review. We first review the district court's factual findings to determine whether they were supported by substantial competent evidence. Our Supreme Court has explained that substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). We then exercise unlimited review over the district court's conclusions of law.

10

*Constitutional Issue*

On appeal, Mother contends for the first time that "the circumstances of the district court's acceptance of the natural mother's voluntary relinquishment violated due process" under the Fourteenth Amendment to the United States Constitution. As a general rule, constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court for review. See *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014). Here, Mother has not attempted to explain why we should consider this constitutional issue when it was not presented to the district court as required by Kansas Supreme Court Rule 6.02(a)(5) (2014 Kan. Ct. R. Annot. 41). See *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014) (cautioning future litigants to comply with the rule); *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015) (declining to address the merits of the appellant's claim because appellant failed to explain why it was properly before the court). Therefore, we find that the issue of due process is not properly before us for review.

*Voluntariness of Mother's Relinquishment*

The only issue properly before us in this appeal is whether Mother voluntarily relinquished her parental rights under the circumstances. Subsections (a) and (b) of K.S.A. 38-2268 govern the voluntary relinquishment of parental rights. Although the statute does not explicitly state that a relinquishment must be "voluntary," it provides that "[a]ll relinquishments to the secretary shall be in writing in substantial conformity with the form for relinquishment," which the judicial council promulgates. K.S.A. 2013 Supp. 38-2268(b)(2); K.S.A. 59-2143.

11

The Kansas Judicial Council has prepared an approved form to be used in cases involving the relinquishment of one's parental rights, which the parties used in this case:

"NOTICE TO PARENT: This is an important legal document and by signing it you are permanently giving up all custody and other parental rights to the child named herein.
. . . .

"5. I do hereby relinquish the child to the Secretary of DCF, which I understand the Secretary will have full power and all the rights of a birth parent or legal guardian over the child, including the power to place the child for adoption and give consent thereto.

"6. I wish to, and I understand that by signing this relinquishment I do, permanently give up all custody and other parental rights I have to such child, including the right to receive notice of any subsequent adoption proceedings involving the child.

"7. I have read and understand the above and I am signing it as my free and voluntary act." (Emphasis added.) (http://www.kansasjudicialcouncil.org/183_Relinquishment_MinorChild_Agency.pdf) (Relinquishment of Minor child to Agency).

See also K.S.A. 59-2124(b) ("All relinquishments to an agency under K.S.A. 59-2111 through 59-2143, and amendments thereto, shall be deemed sufficient if in substantial compliance with the form for relinquishment set forth by the judicial council.").

K.S.A. 2013 Supp. 38-2268 provides several procedural safeguards to ensure that parents voluntarily relinquish their rights. The relinquishment must be in writing, it must substantially conform to the form provided by the judicial council, it must be acknowledged before a judge or notary, and if acknowledged before a judge, the judge must advise the parent of the consequences of relinquishing parental rights. See K.S.A. 2013 Supp. 38-2268(b), (2) (b)(3); *In re C.D.A.*, 2014 WL 5801348, at *4. In addition,

12

the statute provides that when a parent relinquishes his or her parental rights under the mistaken belief that the other parent would relinquish his or her rights or would be found unfit, the rights of the parent who has relinquished will not be terminated. K.S.A. 2013 Supp. 38-2268(b)(5). Such safeguards make sense because the statute addresses parents' fundamental right to make decisions concerning the care, custody, and control of their children. See *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, 653-54, 16 P.3d 962 (2001).

As the district court noted, consent to adoption and relinquishment of parental rights are related concepts. See *State ex rel. Secretary of SRS v. Bohrer*, 286 Kan. 898, 914, 189 P.3d 1157 (2008); *In re C.D.A.*, 2014 WL 5801348, at *7. In such cases, whether consent was freely and voluntarily given depends on the facts and the circumstances of each case. *In re Adoption of X.J.A.*, 284 Kan. at 876 (citing *In re Adoption of Irons*, 235 Kan. 540, 684 P.2d 332 [1984]); *In re Adoption of Z.N.E.*, No. 111,348, 2014 WL 3907120, at *4 (Kan. App.), *rev. denied* 300 Kan. 1103 (2014).

We note that that the judicial council's form used for consent to adoption is similar to the one used for relinquishment of parental rights, and we believe it is appropriate to look to adoption cases for guidance in relinquishment cases such as the present case. (http://www.kansasjudicialcouncil.org/Documents/Miscellaneous%20Forms/PDF/KSA59 _2129_ConsentToAdoption.pdf). Moreover, when consent to adoption is properly acknowledged, such acknowledgement serves as prima facie proof that the written consent was freely and voluntarily given, and the consenting parent must show fraud, duress, undue influence, mistake, or lack of understanding to rebut the presumption. *In re Adoption of Trent*, 229 Kan. 224, 228, 624 P.2d 433 (1981); *In re Adoption of J.A.B.*, 26 Kan. App. 2d 959, 966, 997 P.2d 98 (2000).

The record reveals that substantial competent evidence supports the district court's finding that Mother gave a knowing and voluntary consent. First, the district court went

13

to great lengths to ensure that Mother understood the gravity of her decision. Before adjourning the October 1, 2014, hearing the district court pointed out that relinquishing her parental rights was "a big, major decision" and encouraged her to think it over and speak with her attorney. During the hearing to review Mother's written relinquishment, the district court read each provision of the form aloud, and Mother initialed and verbally affirmed that she agreed to each term.

To support her claim on appeal that she was involuntarily agreeing to relinquish her parental rights, Mother repeatedly cites to her response of "I have no other choice in this case" when the district court asked her if she had considered the consequences of relinquishing. Although this statement does not clearly indicate her state of mind, it appears to reflect Mother's struggle to make such a difficult decision. In particular, her struggle to reconcile her desire to keep her children with her inability to care for them. We can find nothing in the record to support her argument that she was forced or compelled to relinquish her parental rights. In fact, the district court gave her a 30-day continuance of the relinquishment hearing so Mother would have sufficient time to make such an important decision.

Attorney Baumgartner's testimony further reveals that her decision was voluntary. He testified that "there was no change in her position" even after he reminded her—while reviewing the relinquishment form on November 3, 2014—that she was on a good pace to get her children back at some point in the future. Further, Baumgartner explained to Mother that it was her responsibility alone to decide whether to voluntarily relinquish her parental rights and that the court was not ordering her to do so. Moreover, as the district court accurately observed, "when the mother showed up for the review hearing on October 1, 2014, [she] had decided that it would be best for her children for her to relinquish her parental rights."

14

Mother testified at the hearing on the motion to withdraw relinquishment that she felt pressured to relinquish her parental rights because she was allegedly given the impression that she would be able to see her children if she did so rather than waiting until the district court terminated them. Interestingly, Mother stated that she did not get this impression from Baumgartner even though Wisdom and Townsdin testified that they had both advised her to speak with her attorney before making a decision regarding relinquishment.

Baumgartner testified that he had told her several times that she did not need to relinquish her parental rights because she was making good progress towards reintegration. Although Mother testified that at the time she relinquished her parental rights she felt "the world was crashing in on me," there is nothing in the record to indicate that she was under duress at the time. Indeed, our Supreme Court has stated in dicta that there is "no merit in the contention that judicial proceedings, per se, subject a parent to duress which might invalidate a voluntary relinquishment." *In re A.W.*, 241 Kan. 810, 816, 740 P.2d 82 (1987).

Mother also refers to her general "psychological status" to argue that she involuntarily relinquished her rights to the children. But she "has set forth nothing more than assertions of incapacity and no specific evidence that at the time [she] stood before the court, she lacked the capacity to consent." *In re Adoption of J.A.B.*, 26 Kan. App. 2d at 967. Rather, her therapist noted during a session approximately 2 weeks before the October 1, 2014, hearing that her mood was "normal" and "overall positive" and that "she had success of managing her recent issues with her mood." We can find nothing in the record to indicate that Mother was not mentally competent at the time she voluntarily relinquished her parental rights.

Although this is a difficult case, we conclude that there is substantial competent evidence in the record to support the district court's factual findings. We also conclude

15

that the district court applied the appropriate legal standards in considering whether Mother voluntarily relinquished her parental rights. We, therefore, affirm the district court's denial of Mother's motion to withdraw relinquishment.

Affirmed.