(571 P 2d 70)
No. 48,648

Harry Rediker, *Appellee,* v. Chicago, Rock Island and Pacific Railroad Company, *Appellant.*
Petition for review denied October 26, 1977.
*Certiorari* granted March 20, 1978.

Opinion filed August 19, 1977.

*Mark L. Bennett, Jr.,* of Davis and Bennett, of Topeka, and *John J. Jurcyk, Jr.,* of McAnany, Van Cleave and Phillips, of Kansas City, for the appellant.

*G. Michael O'Neal,* of Hubbell, Lane and Sawyer, of Kansas City, Mo., and *Robert D. Loughbom,* of Kansas City, for the appellee.

Before Harman, C.J., Foth and Spencer, JJ.

Harman, C.J.: Plaintiff sued defendant railroad pursuant to the

Federal Employers' Liability Act for loss of a leg and other injuries sustained when he fell beneath the wheels of a freight car on which he was coupling air hoses. Trial to a jury resulted in a verdict for plaintiff for $450,000. Defendant appeals from a judgment rendered thereon.

Plaintiff Harry Rediker, forty-two years of age, had worked for the Rock Island Railroad as a carman and car inspector at its Herington, Kansas, yards for twenty-two years prior to his injury. On the day in question, September 10, 1973, he commenced work at 3:30 p.m. His duties included inspecting all trains for defects, conducting air tests, making light repairs and coupling air hoses between railroad cars. He was equipped with a lantern and a walkie-talkie radio which enabled him to communicate with the yardmaster, who was in charge of all train movements, and with the engineers on two switch engines operating in the yard at that time.

Plaintiff was informed of certain switching operations to be done in connection with a train (No. 02) which would arrive from the southwest during plaintiff's shift: One switch engine would move against the front or north end of the 02 train, remove a number of cars from its front end, set them over on the No. 2 track and couple them into a string of cars already standing there; another would move against the rear of the 02 train, remove fifty cars from it, set the cars over on the No. 2 track and couple twenty cars into the south end of the cars already there.

Prior to the 02 train's arrival, plaintiff proceeded to couple air hoses between cars in the string then standing on the No. 2 track. When the 02 train arrived, plaintiff told another car inspector he would bleed the air off the 02 train's cars. He did not tell anyone he would be returning to the No. 2 track. After reaching the north end of the main line he started back south when he saw by means of his lantern that the air hoses between the two north cars on the No. 2 track were disconnected (this occurred sometime after plaintiff's 8:30 p.m. lunch period). Plaintiff then stepped between the two cars to couple the hoses. As he did so the switch engine at the south end of the track shoved a string of fifty cars to couple them into the sixty cars already standing there. The resulting movement of the cars for about one to one and one-half car lengths caused plaintiff to fall under the wheels, injuring the tips of his fingers on his right hand and ultimately causing amputa-

tion of his right leg two inches below the knee. Further evidence will be stated in connection with the points raised.

In plaintiff's petition, his amended petition and in the pretrial order the grounds of defendant's negligence were stated to be: (1) Causing the cars to be moved suddenly and with unusual force, and (2) causing the cars to be moved suddenly and without warning to plaintiff. At trial upon conclusion of plaintiff's evidence he moved the court for permission to conform his pleading to the evidence by adding a general allegation of negligence, namely, failure to furnish a safe place to work. Defendant objected and the requested amendment was denied. At the conclusion of all the evidence the trial court gave the following instruction to the jury:

"12. The plaintiff claims that he was injured and sustained damages as a result of the negligence of the defendant in one or more of the following respects:

"a. In failing to provide a safe place to work;

"b. In causing the cars to be moved suddenly and with unusual force;

"c. In causing the cars to be moved suddenly and without any warning to plaintiff."

Defendant objected to the giving of 12a. Along with its general verdict the jury answered certain questions:

"1. Do you find from the evidence that the Chicago, Rock Island and Pacific Railroad Company was guilty of negligence which was a direct cause of the plaintiff's injuries?

"ANSWER: Yes.

"2. If your answer to Question No. 1 is in the affirmative, state the acts or acts of negligence of which the Chicago, Rock Island and Pacific Railroad Company was guilty.

"ANSWER: 1. Not safe place to work.

"2. Engineer on switch engine was not paying attention.

"3. Safety rules were not enforced."

Defendant-appellant's first point on appeal is that the trial court erred in adding failure to provide a safe place to work as a general ground of negligence. The argument is that the pretrial order should have controlled and appellant was deprived of opportunity to defend against that general allegation. First, it may be observed that under controlling federal law the rule which requires a railroad to furnish its employees with a reasonably safe place to work refers not only to the physical condition of the place itself but may include negligent acts of fellow employees (*Bailey v. Central Vermont Ry.*, 319 U.S. 350, 87 L.ed. 1444, 63 S.Ct.

1062; *Griswold v. Gardner,* 155 F.2d 333). Counsel for the parties may well have had this rule in mind as revealed by events and colloquy at trial. In *voir dire* examination appellee's counsel stated recovery could be had "if you find it was negligent for them to move the cars while he was between them, whether they failed to furnish him a safe place to work." In appellee's opening statement it was said, "The evidence will show that this was an unsafe place to work." There was no objection to either statement. Later, in argument before the court on appellee's request to amend his petition to conform to the evidence and after appellant had objected, this colloquy occurred:

"MR. LANE: The pre-trial order was ten months ago. And, actually, what we have proved is an unsafe place to work, regardless of what we have called it. And under the F.E.L.A., it is an unsafe place to work. The cases and the statute have said this was to be freely allowed, and we have actually, in fact, proved an unsafe place to work and we have proved negligence.

"We have called this an unsafe place to work in our voir dire, in our opening statement, and counsel has said nothing about that; so, it has really gone in as an unsafe place to work.

"MR. BENNETT: He has alleged, in his allegations of negligence, that it was an unsafe place to work, in certain respects, and that is why there hasn't been anything said about his voir dire or his own opening statement. But, certainly, we didn't enter into this trial with any understanding we were faced with anything other than what was alleged in that pre-trial order."

Then, after the court had submitted its proposed instructions to counsel, this occurred:

"MR. BENNETT: We would, then—going back, first, in reference to 12a., at the top of the page.

"THE COURT: All right, sir.

"MR. BENNETT: We would object to the giving of that instruction in the form in which it is presently set out, as it relates to 12a., b., and c., and the allegations of the plaintiff as to the negligence of the defendant for the reason that that does not reflect accurately the allegations of negligence which were—which are contained in the pleadings, including the pre-trial order.

"There is no separate allegation in the pre-trial order as to negligence in failing to provide a safe place to work, rather they make that allegation with specificity, and they allege in that, in the pre-trial order, in the pleadings, that the defendant was negligent in providing a safe place to work in certain specified—in a certain specified manner, and with no indication whatsoever that it occurred in any way other than in that the defendant negligently caused and permitted the cars to be moved on the tracks suddenly and with unusual force and violence.

"And it goes on, 'and without any warning,' in Paragraph b. It is our position that, in effect, what is done by the giving of this instruction is, in effect, opening up a whole new area of allegations, and to allow the plaintiff to argue any number

of other possible acts of negligence, none of which the defendant commenced this trial with any idea that it was going to have to defend against. We came in here with the understanding that we would be defending against the two specific allegations set out in the pre-trial order, and nothing else.

"And to give the instruction, in the manner in which it does, just literally opens Pandora's box.

"THE COURT: Well, I think, however, in looking at the act in its entirety, and with particular reference to my Instruction No. 13, and the evidence throughout the course of the trial, and particularly on plaintiff's side of the lawsuit, the objection is noted and it is overruled, Mr. Bennett.

"MR. LYSAUGHT: Judge, not to quarrel with your ruling, maybe you misinterpreted what we mean. What we meant to say was, instead of making (a) a specific act, the way the pre-trial order was drawn, it would be that, in failing to provide a safe place to work in the following particulars—in one or more of the following particulars: (1) In causing the cars to be moved suddenly and with unusual force; and (2) in causing the cars to be moved suddenly and without any warning to the plaintiff. That is the meat of their grounds.

"Under the general law of safe place to work, they must specify what—in what manner that they didn't give them a safe place to work. And I think that's the only thing we are quarreling about. If that were added to that a.

"THE COURT: I understand. You are telling me the same thing he did, in different words."

Although there is no instruction numbered 13 in the court's instructions appearing in our printed record on appeal, an unnumbered paragraph in them immediately preceding instruction 14 (presumably the one referred to by the court) stated:

"It is the duty of a railroad to use reasonable care to provide its employees a safe place to work. The degree of care depends upon the danger involved in the work and all the circumstances then existing."

This instruction was never challenged.

Appellant cites in support of its position pre-modern procedural code cases which strictly limit issues to those specifically joined in the pleadings. These cases are not in harmony with present procedural codes. K.S.A. 60-215 (*b*) provides:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

The thrust of appellant's trial objection to instruction 12a. seems to have been directed towards its form, that is, that it should embrace the two grounds of negligence already pleaded and stated in the pretrial. In any event, the matter does not appear to have been of great moment to appellant at the time. In fact as a part of a long list of sequentially numbered requested instructions appellant submitted the following:

"It was the continuing duty of the defendant, as an employer, at the time and place in question, to use ordinary care under the circumstances, in furnishing the plaintiff with a reasonably safe place in which to work, and to use ordinary care under the circumstances to maintain and keep such place of work in a reasonably safe condition. This does not mean, of course, that the employer is a guarantor or insurer of the safety of the place to work. The extent of the employer's duty is to exercise ordinary care, under the circumstances, to see that the place in which the work is to be performed is reasonably safe, under the circumstances shown by the evidence in the case."

A litigant could well be prejudiced when a separate and distinct ground of liability is introduced for the first time in an instruction but there is no showing that was the case here. Appellant made no request to reopen its case and offer further evidence in the light of the proposed instruction. Its cross-examination of adverse witnesses was thorough. It has not demonstrated that anything untoward occurred in the oral argument or elsewhere, that is, that argument was made which went beyond the evidence and introduced matter against which appellant had no opportunity to defend or that appellant was faced with anything other than that alleged in the pretrial order. There is no indication anyone was misled or that anything came out of Pandora's box. The trial court might well have granted appellee's request for amendment at the conclusion of his evidence and "cleaned up" the instruction in harmony with appellant's suggestions but we see nothing prejudicial in the failure to do either. Beyond this, as will presently be seen, it appears the verdict can properly be upheld on the jury's answer No. 2 to special question No. 2: "Engineer on switch engine was not paying attention."

Appellant next asserts there was no substantial evidence that it was guilty of any of the acts of negligence alleged in appellee's petition and the jury answers acquitted it of those grounds. In nice, neat, legal language the petition alleged appellant caused the cars to be moved suddenly and with unusual force, and

without warning to appellee. Under the evidence the engineer on the south switch engine was a key figure in these events. This switching crew was composed of four persons, the engineer and three switchmen, Kristek, Smith and Otte.

Appellee's evidence showed it was not customary to move cars standing on the No. 2 track to the north under the existing circumstances and there was no warning of this particular movement; that the suddenness and force of movement of cars is dependent not only on the speed of the switching movement but on the number of cars being moved, their loads and the amount of slack between the cars. Here there were about fifty cars being shoved into a string of sixty in which the slack had been taken up and which were not to be moved again in the switching operation. Because of darkness and distances caused by the number of cars being switched, signals had to be relayed by lantern. Switchman Kristek was at the south end of the standing cars on track 2 to supervise the coupling. He gave signals to Smith, who relayed them on to Otte and the engineer. After the cars had started moving northward some distance Kristek gave an "easy" or slow signal to Smith which was relayed on (an "easy" signal means the cars are going too fast). However, the cars did not slow down as a result of which Kristek gave a stop signal and then later a "washout" or emergency stop signal (a "washout" signal means the cars are getting too close and going too fast and the engineer will do everything in his power to stop as quickly as he can). Otte was close to the engineer to help pass signals to him. The emergency signal was seen by Otte but neither it nor the "easy" signal was seen by the engineer, according to his own testimony. The speed of the coupling movement was from one to four miles per hour. There was evidence the coupling of the two strings of cars was "hard" and a "rough joint" which moved the standing cars northward one car length or more at a time they should not have been moved. Appellee asserts all this shows the engineer was inattentive or that he ignored the signals.

In *Kettler v. Phillips,* 191 Kan. 486, 382 P.2d 478, this was said:

". . . The rule of consistency, in the negligence charged in the petition and the negligence found by the jury, does not require that the same adjectives, adverbs, or phrases be used. The rule is satisfied if the language used is reasonably synonymous.

" '. . . [A] jury of laymen is not required to answer special questions in the precise language used by a lawyer in drafting a pleading. . . .'

*"(Spencer v. Eby Construction Co.,* 186 Kan. 345, 350, 350 P.2d 18." (p. 489.)

It might be added that the foregoing rule is satisfied if the answer can reasonably be construed to be included in the negligence charged.

Here it clearly appears that in part 2 of its answer the jury was fingering, in lay language, the engineer as the one responsible for the sudden, forceful and unexpected movement of cars which injured appellee. The answer that the engineer was not paying attention was fairly included in the negligence charged and it sufficiently convicted appellant of the negligence charged. There was some dispute in the evidence but that favorable to appellee adequately supported the finding.

We need not discuss to any extent part 3 of the answer which found that appellant did not enforce safety rules. Appellant introduced the issue by charging appellee violated the blue flag or blue light rule—a rule stating that a blue signal displayed at an end of a car means that a workman is under or about the car and that each class of workmen will display the blue signals. No blue signal was displayed at the time in question. Appellee responded with his own testimony and that of fellow workmen that in their years of employment with appellant they had never seen or been furnished a blue flag or light. The answer at the least was consistent with appellee's testimony and not inconsistent with the general verdict or part 2 of the answer.

Appellant next complains of the trial court's refusal to permit cross-examination of appellee's actuarial witness concerning the impact of income taxation upon his computation as to the amount of appellee's future earnings. The matter of income taxes has arisen in personal injury suits in two ways: Should future taxes be deducted from future wages in determining damages from the deprivation of future earnings, or should a jury be told the fact that an award of damages is not subject to income tax? Many jurisdictions, including our own, have dealt with the issue. The vast majority holds that a jury should not be told of this exemption, ruling either that income tax consequences cannot be considered or that cautionary instructions should not be given concerning nontaxability of the award. See Anno.: Damages—Considering Income Taxes, 63 A.L.R.2d 1393, and Later Case Service. Reasons given include:

(1) Income tax liability or saving is a matter not pertinent to the

damages issue, being a matter of concern between the plaintiff and the taxing authority.

(2) The amount of income tax which might become due on one's prospective earnings in future years is too conjectural to be considered in fixing damages.

(3) To admit income tax matter into a lawsuit for damages would be unduly complicated and confusing.

(4) If the jury were to mitigate damages by reason of income tax exemption, legislative intent to give the injured party a tax benefit would be nullified.

The matter was thoroughly explored in *Spencer v. Eby Construction Co.,* 186 Kan. 345, 350 P.2d 18. In concluding that in a personal injury action the incidence of federal or state income taxation is not a proper factor to be considered by the jury in making an award of damages (Syl. 1) the court took into account all the reasons mentioned above. Appellant's assertion of error cannot be sustained.

Appellant contends the trial court erred in refusing to give eight of its requested instructions. At trial appellant objected to the refusal only as to two of the requested instructions in accord with K.S.A. 60-251 (*b*) which provides that no person may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the ground of objection, unless the instruction is clearly erroneous. (For interpretation of this statute with regard to the refusal of requested instructions see *Bott v. Wendler,* 203 Kan. 212, 453 P.2d 100.) We have already dealt with one of the requested instructions which related to the grounds of negligence and have resolved the matter. The other stated the mere fact that an accident happened, standing alone, does not, unless otherwise expressly stated, permit the jury to draw the inference that the accident was caused by anyone's negligence. Such an instruction is unnecessary when a jury is otherwise properly instructed on negligence, causation and burden of proof as was the case here.

Despite the failure to object specifically to the refusal to give the others and state the grounds therefor we have considered the refusals and conclude no error occurred. We need say only that those given, considered as a whole, adequately covered the ground—those refused were either repetitive, unnecessary, argumentative or, in the case of the one dealing with income tax impact, improper.

Finally appellant contends the verdict is excessive and results in unjust enrichment. Compensatory damages of $450,000 were awarded by the jury and approved by the trial court after denial of new trial and remittitur. The argument is primarily two-fold: First, no consideration was given to the fact appellee's projected earnings would be reduced by federal and state income taxes—a proposition we have rejected—and, Second, that appellee's actuarial witness used an investment figure of 5½% interest per annum in computing the present value of appellee's projected earnings over his life expectancy. Appellant did elicit from the witness the fact that banks then paid up to 7% interest on long term certificates of deposit and even higher rates could be secured from building and loan associations. Thus the jury had this information before it in considering its award. Appellant did not object to any of the witness' testimony nor did it offer any computations of its own as to appellee's future wage loss. Appellant's argument of excessiveness is focused largely on this item to the exclusion of other elements of damage which can only be regarded as substantial. Pain and suffering and accompanying mental anguish are ignored.

The jury was instructed in accord with PIK Civil 9.01. Appellee was entitled to recover for his disability, including lost earnings and earning capacity, past and future; for pain and suffering and accompanying mental anguish, past and future; and for medical expenses, past and future, a subject on which the record is mostly silent. There was evidence appellee had lost $30,000 in wages at the time of trial. He can no longer perform his railroad job or other manual labor and has commenced rehabilitation training. Taking into account rising consumer prices and wage scales his reasonable loss of wages was shown to be over $500,000. He endured great pain when his leg was crushed beneath the car wheel. The tips of his fingers on the right hand were crushed. He underwent surgery to amputate his right leg just below the knee. After this, he had much pain in his stump. He underwent a second operation because of gangrene in his stump. It became necessary to make a skin graft. His right thigh shrank. He received a prosthesis which was painful to use. The seven pound prosthesis is held on by a strap around his waist which causes constant back pain. It is necessary for him to remove the prosthesis during the day and rest. He has a constant feeling of tingling or electrical shock in his stump. He cannot enjoy recreational

activities as before his injury. His injured fingers are always cold and tender and he is unable to pick up small objects with his right hand.

A specialist in orthopedic surgery who treated appellee testified appellee is at a disadvantage because of the shortness of his stump, the optimum stump length being five and one-half inches; that he had a bad amputation for fitting an artificial leg; "it is rubbing wrong" and the stump will not last through appellee's life expectancy; that x-rays show changes in the knee joint and the bones have softened; appellee would probably be better off with an amputation through the thigh; appellee's right leg condition is painful and the pain is permanent.

In *Domann v. Pence,* 183 Kan. 135, 325 P.2d 321, this was said:

". . . [T]here is of course no uniformity in our decisions on the proposition of when damages allowed in a personal injury action are excessive for the simple reason determination of the question necessarily depends upon the facts and circumstances of each particular case as it is presented for review. . . . No verdict is right which more than compensates—and none is right which fails to compensate. . . . Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence." (p. 141.)

In *Riggs v. Missouri-Kansas-Texas Rld. Co.,* 211 Kan. 795, 508 P.2d 850, the court stated:

". . . In order for a judgment to be set aside on the grounds of an excessive verdict, it must appear that the amount of the verdict is so grossly excessive as to shock the conscience of the court." (p. 802.)

The verdict was not itemized so it represented all elements of damage allowable to appellee. We have no way of knowing how much was apportioned for the various items. At time of trial appellee had a life expectancy of twenty-seven years. His injury was grievous and his pain was shown to be of a permanent nature. Everything considered, particularly the difficulty of measuring pain and suffering in monetary terms, the amount seems to be within the bounds of reason and is not such as to be shocking to the court.

The judgment is affirmed.