John ANUNTI et al., Respondents,

v.

Clarence E. PAYETTE, Appellant,

Joe William Sayler, Respondent.

No. 47658.

Supreme Court of Minnesota.

June 9, 1978.

Johnson, Fredin, Killen, Thibodeau & Seiler and Dennis L. O'Toole, John J. Killen, Jr., Duluth, for appellant.

Mathais & Brown, Duluth, for Anunti.

Donovan & Harper and Robert K. McCarthy, Duluth, for Sayler.

Heard before PETERSON, KELLY, and IRVINE, JJ., and considered and decided by the court en banc.

PER CURIAM.

Defendant Clarence E. Payette appeals from a judgment for plaintiffs following a jury verdict for $391,600 in a personal injury action and from the denial of his motion for a new trial and other relief. We affirm.

·The action arose out of an intersection collision between an automobile driven by defendant Joe William Sayler and one driven by defendant Payette in which plaintiff John Anunti was a passenger. The collision occurred on July 16, 1971, at the intersection of 54th Avenue East and Glenwood Street in Duluth when the Payette automobile, which was traveling north on 54th Avenue, failed to stop for a stop sign and was struck by the Sayler automobile which was traveling west on Glenwood. The trial court directed the jury to find that Payette was negligent and that his negligence was a direct cause of the collision. The jury, by special interrogatories, found Payette 100-percent negligent and awarded plaintiff John Anunti $346,600 and plaintiff Kathleen Anunti $45,000. The trial court ordered judgment in those amounts against Payette.

Payette raises the following issues on appeal: (1) The trial court erred in directing the jury to find that Payette was negligent and that his negligence was a direct cause of the collision; (2) the jury's answers to the special interrogatories are not supported by the evidence of the law; (3) excessive damages were awarded under the influence of passion or prejudice; (4) the final argument by plaintiffs' attorney was prejudicial on the issue of damages; (5) the trial court erred in failing to instruct the jury that any damages it awarded would not be subject to Federal income taxation; and (6) the trial court erred in failing to reduce the jury award by the amount of plaintiffs' out-of-court settlement with defendant Sayler.

█ 1. A detailed recitation of the evidence is unnecessary in view of the overwhelming evidence that Payette failed to stop for a stop sign and as a result was struck by the Sayler vehicle which was traveling on a through street. Payette concedes "that he entered the intersection from a street controlled by a stop sign * * *" but argues, relying on certain language in *Riley v. Lake,* 295 Minn. 43, 203 N.W.2d 331

(1972),[1] that there was compelling evidence to excuse that violation. That evidence is his testimony that the stop sign was obscured by a tree and that he was not aware of the change in location of the stop signs at the intersection.

We are of the opinion that the trial court was justified in holding as a matter of law that Payette was negligent and that his negligence was a direct cause of the accident. The evidence concerning the visibility of the stop sign is uncontradicted that the stop sign was in place on the day of the accident, that the tree was 36 feet from the stop sign, and that the stop sign was clearly visible after passing the tree. In addition, an investigating officer testified that shortly after the accident he drove his patrol car toward the stop sign and had no trouble stopping his vehicle once past the point of the tree.

Payette's claim that he was unaware that the location of the stop signs at the intersection had been changed is based on his testimony that he had traveled 54th Avenue East at a time when it was the through street and stop signs controlled traffic on Glenwood Street and had discontinued travel on that route prior to the time the signs were changed. The evidence shows, however, that the stop signs were changed 9 months prior to the accident. More importantly, the evidence shows that a "Stop Ahead" sign was installed approximately three-fourths of a block south of the stop sign 4 days after the stop sign was installed, that the "Stop Ahead" sign was in place on the day of the accident, and that it too was clearly visible. In addition, Payette's statement to an investigating officer that he forgot about the stop sign was repeated twice at trial. The only conflicting evidence is Payette's testimony that the "Stop Ahead" sign was not in place on the morning of the accident. On this evidence we think that reasonable minds could not differ that Payette's admitted failure to see the stop sign was without justification or excuse and that the trial court's direction to

the jury was proper. See, *Van Tassel v. Hillerns*, Minn., 248 N.W.2d 313 (1976).

■ 2. Payette challenges the jury's answers to the special interrogatories on the ground that plaintiffs failed to prove a causal connection between Anunti's injuries and any negligence on the part of Payette. Reviewing the record we find ample evidence to support the jury's verdict. Anunti was taken from the scene by ambulance to a hospital and was hospitalized initially for 2½ days, complaining of dizziness and headaches, back pains, and pain in his left arm and right leg. Following his discharge from the hospital he continued to complain of the same problems and developed, in addition, difficulty in maintaining his balance. Two weeks after the accident, Anunti was hospitalized again, this time by a neurosurgeon who diagnosed the cause of his problems as a nystagmus which could be related either to the labyrinthine system within the petrous bone of the skull or to problems within the brain stem.

Anunti was then referred to an otolaryngologist, who initially diagnosed his hearing and balance problems as resulting from a disruption of the incus and stapes. That diagnosis was confirmed by surgery performed on his left ear in 1971. When Anunti continued to complain of dizziness following the surgery, further tests were conducted which resulted in a diagnosis of cupulomethiasis. Further testing showed Anunti's dizziness to result from brain stem damage rather than damage to the inner ear.

In September 1972, Anunti suffered a heart attack, diagnosed by his attending physician as an inferior myocardial infarction due to arteriosclerotic heart disease and coronary artery thrombosis. Anunti testified that the same dizziness and balance problems continued after the heart attack. He also testified that he had developed an irritable and quarrelsome disposition and a limp, described at trial as a bizarre gait, which requires his body to be at an angle when he walks.

---

1. "Where there is no evidence to excuse a violation of the right-of-way statute, the court should hold the violator negligent as a matter of law." *Riley v. Lake*, 295 Minn. 43, 53, 203 N.W.2d 331, 338 (1972).

This evidence was supported at trial by expert medical testimony that Anunti suffered cupulomethiasis, a brain stem injury, and permanent hearing loss in both ears, all caused by the accident. Medical experts further testified that Anunti's balance problem was caused by the accident. Medical experts also testified that his bizarre gait was the result of a conversion reaction caused by the collision and the events following it. There was some question as to the cause of the myocardial infarction, but Anunti's attending physician testified on cross-examination that factors such as prolonged pain and emotional stresses could cause a myocardial infarction. The jury was free to accept or reject such testimony. Finally, there was little doubt among medical experts that Anunti's injuries rendered him permanently incapable of any meaningful employment. In sum, the verdict was amply supported by the evidence and the law.

 3. Payette's claim that excessive damages were awarded under the influence of passion and prejudice merits little discussion in light of our decision in *Busch v. Busch Construction, Inc.*, Minn., 262 N.W.2d 377 (1977). Anunti's medical expenses totaled approximately $5,300. As a result of his injuries, Anunti, a skilled union welder and pipefitter, was and remains completely and totally disabled as a result of the accident. The evidence supports an award of past lost earnings of $58,650 and future lost earnings, discounted to present value, of $337,235. In addition, the jury had a right to consider Anunti's past and future pain and suffering, the degree of disfigurement evidenced by his bizarre gait, the permanent disability involved, and the effect of his injuries on the enjoyment of the amenities of life. See, *Ossenfort v. Associated Milk Producers, Inc.*, Minn., 254 N.W.2d 672 (1977). Based on this evidence, the jury's award was not excessive.

 4. Payette contends that the final argument of plaintiffs' attorney was so prejudicial as to require a new trial. The alleged misconduct was counsel's reference to the high "wages" paid professional sports figures followed by a reference to Anunti as "the little guy, the working guy." The trial court in its memorandum in support of its order denying a new trial stated that counsel's reference to the large sums paid such entertainers was made only "in such a way as to impress the jury of the importance to this [plaintiff] in asking for a large sum. The plaintiff's attorney did not say that plaintiff was worth as much as the professional sports figures, nor did he suggest that the jury use those figures in computing damages." Under these circumstances we cannot say that counsel's remarks exceeded the bounds of propriety. Even if counsel's remarks were improper, any error was harmless since the remarks were addressed only to the issue of damages and the verdict is not excessive. See, *Elkins v. Minneapolis St. Ry. Co.*, 199 Minn. 63, 270 N.W. 914 (1937).

 5. The trial court refused Payette's requested jury instructions that any damage award would not be subject to Federal income taxation. On appeal Payette asserts that this refusal was error, but concedes that the requested instructions do not reflect the law in Minnesota or in a majority of jurisdictions. See, *Briggs v. Chicago G. W. Ry. Co.*, 248 Minn. 418, 80 N.W.2d 625 (1957); Annotation, 63 A.L.R.2d 1393. In view of Payette's cryptic argument we are not now inclined to change the law in Minnesota.[2]

 6. After the jury had begun its deliberations but before it had returned its verdict, plaintiffs entered into a settlement with defendant Sayler whereby Sayler

2. But see, *Rediker v. Chicago, Rock Island & Pacific R. Co.*, 1 Kan.App.2d 581, 571 P.2d 70 (1977), review denied, Kansas Supreme Court, October 26, 1977, certiorari granted, ── U.S. ──, 98 S.Ct. 1483, 55 L.Ed.2d 514 (1978), where the trial court refused to permit cross-examination of FELA personal injury plaintiff's actuarial witness concerning impact of income taxation on his computation of plaintiff's earnings and held that incidence of Federal or state income taxation was not a proper factor to be considered by the jury in computing damage award in personal injury action.

agreed to pay the sum of $30,000.[3] On appeal Payette argues that the trial court erred in failing to reduce the amount of the judgment by the amount of the settlement. We do not agree.

The basis for Payette's argument is Minn.St. 604.01, subds. 2 and 5. Subdivision 2 provides in part that "[s]ettlement with or any payment made to an injured person * * * shall not constitute an admission of liability * * *." Subdivision 5 reads in pertinent part as follows:

> "All settlements and payments made under subdivision 2 * * * shall be credited against any final settlement or judgment; provided however that in the event that judgment is entered against the person seeking recovery or if a verdict is rendered for an amount less than the total of any such advance payments in favor of the recipient thereof, such person shall not be required to refund any portion of such advance payments voluntarily made. Upon motion to the court in the absence of a jury and upon proper proof thereof, prior to entry of judgment on a verdict, the court shall first apply the provisions of subdivision 1 and then shall reduce the amount of the damages so determined by the amount of the payments previously made to or on behalf of the person entitled to such damages."

While the statute refers to settlements, we agree with the trial court that the language deals only with the question of payments made prior to the determination of the case and that such prepayments shall be credited to any final settlement or judgment. As such, the statute has no application to the facts of this case. Here defendant Sayler remained in the case after executing the settlement agreement and the jury determined that there was no liability on his part. Under these circumstances, Sayler is not a joint tortfeasor and it would be inequitable to allow Payette, the nonsettling defendant, to profit from a settlement agreement between plaintiffs and defendant Sayler by reducing the amount of his own individual liability by the amount of the settlement. Cf. *Pacific Indemnity Co. v. Thompson-Yaeger, Inc.*, 258 N.W.2d 762 (Minn.1977).

Affirmed.

SHERAN, C. J., took no part in the consideration or decision of this case.

---

**3.** The detailed settlement agreement, with covenant and release, includes other provisions fixing defendant Sayler's liability to a maximum of $60,000, with protection against rights of contribution or indemnity by the nonsettling defendant, depending upon the ultimate results of the litigation.