No. 56,551

LILLIAN K. WALTERS, *Appellee*, v. C. THOMAS HITCHCOCK, M.D., *Appellant*.

(697 P.2d 847)

Opinion filed April 5, 1985.

*M. Warren McCamish*, of Williamson & Cubbison, of Kansas City, argued the cause and was on the brief for appellant.

*Gloria M. Vusich*, of Kansas City, and *Felix G. Kancel*, of Kansas City, argued the cause, and were on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is a medical malpractice action wherein plaintiff Lillian K. Walters received a $2,000,000 damage award against defendant C. Thomas Hitchcock, M.D. The defendant physician appeals from the jury's verdict and certain pretrial and post-trial rulings of the district court.

The facts may be summarized as follows. In December, 1979, a lump on the neck of Lillian Walters was discovered by her family physician. Mrs. Walters was, at the time, approximately 32 years of age, married, with four minor children. She was not employed outside the home. The family physician conducted a number of tests and advised her to consult with a surgeon. Mrs. Walters was seen by defendant Hitchcock, a surgeon, on January 7, 1980. As a

result of the prior testing and his physical examination of her, Dr. Hitchcock recommended surgical removal of diseased areas of the thyroid gland. There were indications of a possibly malignant condition. Surgery was scheduled for January 22, 1980. Mrs. Walters was advised the operation was a relatively low risk procedure with an anticipated three-day hospital stay and a small residual scar.

The operation proceeded in what appeared at the time to be a routine manner. Specimens were sent to the pathology laboratory and no malignancy was detected. The patient was sutured and sent to the recovery room. One day later Mrs. Walters' condition rapidly deteriorated. Her head ballooned in size, she became blind and suffered extreme respiratory distress. She was taken to the intensive care unit where a breathing tube was inserted. Shortly thereafter, Dr. Hitchcock was advised by the hospital pathology department that a one inch by one and one-half inch piece of esophagus tissue was connected to the thyroid specimen sent to the laboratory during surgery. Mrs. Walters' wound was now badly infected. She was taken to surgery. Dr. Hitchcock reopened the wound and observed a significant hole in the left front portion of her esophagus. He concluded that repair was not possible and sewed the esophagus shut—thereby closing it permanently.

At this point feeding was possible only through a tube inserted directly into Mrs. Walters' stomach. She regained her vision. Numerous hospitalizations and surgical procedures followed. Ultimately, colon interposition surgery was performed which involved making a sort of bypass esophagus from a portion of Mrs. Walters' colon. Additional facts relative to Mrs. Walters' condition and the quality of her life will be set forth in the discussion of the issue relative to the amount of damages awarded herein.

Mrs. Walters brought this action against Dr. Hitchcock based upon negligence in cutting into the esophagus and in failing to make prompt repair thereof. She sought $4,000,000 in damages. Dr. Hitchcock denied negligence and blamed the injury to the esophagus on the abnormal physiology of Mrs. Walters. The jury awarded Mrs. Walters $2,000,000 in damages and Dr. Hitchcock appeals therefrom.

The first issue on appeal concerns alleged misconduct of

plaintiff's counsel during closing argument. In his closing argument plaintiff's counsel stated:

"Who would sell their esophagus for $4 million? I would not sell mine."

Defendant contends this constitutes a prohibited "golden rule" argument. This term relates to arguments of counsel that jurors should place themselves in the position of the plaintiff. Such arguments are usually improper and may constitute reversible error. See 75 Am. Jur. 2d., Trial § 282, pp. 357-58.

Plaintiff argues the remarks were not asking the jurors to place themselves in plaintiff's shoes, and were merely hypothetical in nature.

The remarks actually span two categories. The comment commencing "Who would sell . . . ." is, we believe, a fair argument relative to claimed damages and is not a "golden rule" argument. The comment that counsel would not sell his esophagus for that sum is testimonial in nature as it is a statement of counsel's personal opinion. This is an improper argument. Does this improper comment constitute reversible error? We believe not. To constitute reversible error there must be a likelihood that the improper remarks changed the result of the trial. See *State v. Dill*, 3 Kan. App. 2d 67, 589 P.2d 634 (1979). We have examined the record and conclude that, in the totality of the circumstances, the improper comment constituted only harmless error.

Additionally, we note that counsel made a timely objection to the remarks and the objection was sustained. Counsel did not request a jury admonition and none was given. Further, the jury had been instructed:

"The evidence you should consider consists only of the testimony of the witnesses and the exhibits which the Court has received.

"Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments, which you are about to hear, are made by the attorneys to discuss the facts and circumstances in this case, and should be confined to the evidence and to reasonable inferences to be drawn therefrom. *Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded*". (Emphasis supplied.)

We conclude this issue is without merit.

The second issue is whether the trial court erred in excluding the opinion testimony of Dr. Arlo S. Hermreck relative to causation of Mrs. Walters' surgical complications. Dr. Hermreck was

called into the treatment of Mrs. Walters by defendant. Dr. Hermreck had been one of defendant's instructors in medical school and the two physicians had remained close. Dr. Hitchcock referred Mrs. Walters to Dr. Hermreck for evaluation and it was Dr. Hermreck who performed the colon interposition surgery and who was, at time of trial, the physician in charge of her care. Dr. Hermreck testified fully as to the treatment he had provided the patient, her present condition, and future prognosis. Dr. Hitchcock desired to call Dr. Hermreck as an expert witness to support his defense that physiological abnormality in Mrs. Walters was the cause of the problem and that Dr. Hitchcock had not been negligent in his treatment of her. The trial court held such opinion testimony would be improper. The ruling was based on a number of considerations which included the close relationship between the two physicians which, the trial court believed, would place Dr. Hermreck in a difficult ethical position. The trial court also stated it believed such testimony would violate the physician-patient privilege (K.S.A. 60-427).

The trial court's reliance on the physician-patient privilege is misplaced. K.S.A. 60-427(d) clearly provides the privilege does not apply in an action in which the condition of the patient is an element or factor in the claim of the patient. Further, the trial court's concern for the rather difficult situation Dr. Hermreck would be placed in testifying relative to his opinion on causation and Dr. Hitchcock's adherence to the standard of care is not a valid reason for excluding the testimony.

As previously stated, it was the position of Dr. Hitchcock that Mrs. Walters' esophagus was abnormal and that its defective condition was the cause of it being cut during the thyroid gland surgery. Dr. Hitchcock called Dr. Loren J. Humphrey, who testified Mrs. Walters' esophagus had an outpouching (a diverticulum) and that it was this abnormality that was cut in the surgery. In essence, Dr. Humphrey testified that Mrs. Walters had an extremely rare abnormality which caused the injury and that Dr. Hitchcock was not at fault in his care of the patient. It should also be noted that, despite the restriction on his testimony, Dr. Hermreck did testify Mrs. Walters' esophagus was, in his opinion, defective prior to the initial surgery. Dr. Hitchcock testified he believed Mrs. Walters must have had a diverticulum

on her esophagus which had been amputated during the surgery. He did not see such a structure but believed, in reconstructing the events, that one must have been present.

Admission of expert testimony lies within the sound discretion of the trial court and its rulings thereon will not be disturbed on appeal in the absence of abuse of discretion. Limiting the number of expert witnesses is also a matter within the discretion of the trial court. *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 671 P.2d 491 (1983). When evidence is excluded by the trial court, the party seeking reversal of the judgment has the burden of demonstrating prejudice by such exclusion. *In re Adoption of Irons*, 235 Kan. 540, 684 P.2d 332 (1984).

We conclude the defendant has failed to show prejudice in the exclusion of Dr. Hermreck's testimony relative to causation. The excluded testimony was cumulative with other expert testimony in the case. Error may not be predicated upon the exclusion of evidence which is merely cumulative and does not add materially to the weight or clarity of that already received. *Powers v. Kansas Power & Light*, 234 Kan. 89. Additionally, Dr. Hermreck, as previously noted, did testify that, in his opinion, Mrs. Walters' esophagus was defective.

For his third issue, defendant contends the trial court erred in refusing to recall the jury to establish jury misconduct.

Attached to defendant's motion for a new trial was an affidavit of defendant's attorney that he had, after trial, talked to three of the jurors and had been advised that the jury during its deliberation had discussed that any recovery herein would be reduced by attorney fees and income taxes. In truth, of course, the recovery would not be reduced by income taxes. However, the truth or falsity of statements made in jury discussions is not the issue before us. Rather we must decide whether the trial court erred in refusing to recall the jurors for examination.

The allegations relative to juror misconduct constituted one of the grounds on which a new trial was sought. K.S.A. 60-259 governs motions for new trial. Jury misconduct is one of the statutory grounds on which a new trial may be granted. Jury misconduct is not one of the grounds for new trial that K.S.A. 60-259(g) requires be submitted on affidavits unless otherwise ordered. This, however, is not determinative of the issue before us. Supreme Court Rule 181 (232 Kan. clvi) states:

"POST-TRIAL CALLING OF JURORS. Jurors shall not be called for hearings on post-trial motions without an order of the court after motion and hearing held to determine whether all or any of the jurors should be called. If jurors are called, informal means other than subpoena should be utilized if possible."

Under this rule, jurors may be recalled for post-trial hearings only by order of the court after hearing on the need therefor. Such recall is not a routine matter. Jury service is a public duty of our citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing counsel's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order recalling the jurors to show the necessity for the order.

Is the affidavit of counsel as to his or her conversations with jurors sufficient to support a claim of error on the part of the trial court in refusing to recall members of the jury? Absent some extraordinary circumstances not present herein, we believe the question must be answered in the negative. There is no reason given why affidavits of the jurors themselves could not have been secured herein rather than counsel's recall of their comments. Without casting any aspersions on the veracity of the particular affidavit of counsel herein, we believe that such affidavits are, generally, insufficient to support a claim of error predicated upon a trial court's refusal to recall a jury. Verbal comments to counsel by jurors following a trial are often made under some stress, may be easily misunderstood or subject to more than one interpretation. An affidavit(s) offered to show the need to recall a jury for examination for alleged misconduct among the jurors during deliberations should come from one present during the alleged misconduct—namely one or more of the jurors. Put another way, the affiant should have personal knowledge of the facts rather than the recitation of hearsay. We therefore conclude the trial court did not err in refusing to recall the jury. This result is in accord with that reached by the Court of Appeals in *Cornejo v. Probst*, 6 Kan. App. 2d 529, 630 P.2d 1202, *rev. denied* 230 Kan. 817 (1981). *Cornejo* involved counsel's verbal statements at the hearing on his motion for new trial relative to his conversations with jurors in contrast with coun-

sel's affidavit relative to juror conversations as is before us. However, much of the rationale of *Cornejo* is equally applicable to the issue herein.

For his final issue, defendant challenges the size of the verdict. In his brief defendant states:

> "In advancing this argument, the defendant is definitely aware of the long line of Kansas cases on the subject and the guidelines that have evolved in those cases. The defendant realizes that the trial court will not be reversed in an order denying new trial *unless* the amount of the verdict, in light of the evidence, shocks the conscience of the appellate court." (Citations omitted.)

Defendant, in support of his argument that the verdict was excessive, directs our attention to the following:

> "1. Plaintiff's medical bills by the time of trial were approximately $59,000.
> "2. There was no claim nor was the jury instructed with regard to lost wages or diminished future earning capacity as Mrs. Walters was not employed during the course of her 19-year marriage.
> "3. The repair surgery and reconstruction by colon interposition were working properly at the time of trial, and no further surgery, with respect to the surgical complication that occurred during the thyroidectomy, was contemplated. . . . No further evidence was presented regarding future medical expenses."

The evidence herein bears out that medical science has done all that it can do to alleviate plaintiff's condition and no further surgery is contemplated, although the same is not ruled out. This does not mean the damage done to Mrs. Walters has been undone and that she has been restored to her previous condition. It simply means her condition cannot be helped by further surgery or treatment. The substitute esophagus fashioned from a part of Mrs. Walters' colon is, apparently, functioning as well as can be expected but that level of function is a source of permanent problems for Mrs. Walters. When she swallows, food does not automatically go to her stomach. It piles up in grotesque bulges in her throat and upper chest. It is necessary for her to manually massage the bulges downward to force the food to her stomach. The process is physically painful. As there is no valve to keep the contents of her stomach from traveling back up the makeshift esophagus, she cannot lie flat and must remain in a position where gravity will keep the contents of her stomach in place. Her condition is embarrassing, distasteful to persons around her, and a major obstacle to leading a normal life. She has serious ongoing digestive problems. At the time of trial her life

expectancy was 41.9 years. The years between Mrs. Walters' injury and attainment of her present level of functioning were a nightmare of pain, disability, hospitalizations and surgical procedures. She has severe disfiguring scars on her neck and torso. Many activities, such as eating and sitting, continue to be painful.

After having reviewed the record, we conclude our collective conscience is not shocked by the size of the verdict herein.

The judgment is affirmed.

SCHROEDER, C.J., dissenting: The magnitude of the verdict in this case is the result of trial error and what purports to be misconduct of the jurors.

In closing argument by counsel for the plaintiff the last thing said to the jury was:

> "Who would sell their esophagus for $4 million? I would not sell mine."

The court holds this to be *harmless* error.

The question in the first part of the remark requires each juror to answer the question as an individual placed in the plaintiff's position. The second part is counsel's opinion based on the evidence in the case. Both are improper. The quoted question falls within what is known as the "golden rule" argument.

Counsel for the defendant objected and the trial court sustained the objection. However, the trial court failed to admonish the jury to disregard this remark.

Kansas cases have discussed situations when prejudicial arguments made by counsel should result in reversal. Where prejudice deprives a party of a fair trial, reversal is mandated. *Henderson v. Hassur*, 225 Kan. 678, 594 P.2d 650 (1979); *Masson v. Kansas City Power & Light Co.*, 7 Kan. App. 2d 344, 642 P.2d 113, *rev. denied* 231 Kan. 801 (1982). The Florida court in *Bullock v. Branch*, 130 So. 2d 74 (Fla. Dist. App. 1961), held the prejudicial and inflammatory effect of an argument need not be demonstrated in a case of this kind to show reversible error but may be presumed from the fact of the making of such an improper argument. In its opinion the court stated:

> "It is hard to conceive of anything that would more quickly destroy the structure of rules and principles which have been accepted by the courts as the standards for measuring damages in actions of law, than for the juries to award damages in accordance with the standard of what they themselves would want if

they or a loved one had received the injuries suffered by a plaintiff. In some cases, indeed, many a juror would feel that all the money in the world could not compensate him for such an injury to himself or his wife or children. Such a notion as this—the identifying of the juror with a plaintiff's injuries—could hardly fail to result in injustice under our law, however profitable it might be deemed by many plaintiffs in personal injury suits." 130 So. 2d at 76.

Furthermore, misconduct of the jury was clearly suggested.

The foreman of the jury disclosed that the jury considered the fact that any award to the plaintiff would be reduced by a percentage of attorney fees and, further, that the award would be cut in half by federal income taxes. Counsel for the defendant was able to confirm this statement by talking with two other jurors, following which counsel for the defendant presented an affidavit to the trial court with his motion for a new trial. There was no response by plaintiff's counsel to refute this affidavit. At the hearing on the motion, defendant's counsel requested the court to call the entire jury panel to confirm, under oath and on the record, that such considerations had occurred. This was summarily denied by the trial court.

Under K.S.A. 60-259(a) the first ground upon which a new trial may be granted is *misconduct of the jury*. This ground *is not one* that requires the production of evidence at the hearing on a motion for a new trial by affidavit under K.S.A. 60-259(g).

The court, in its opinion, brushes this point off summarily by saying extraordinary circumstances are not present herein to support a claim of error, and suggests that affidavits of the jurors were necessary.

Evidence admissible at a hearing on the motion for a new trial under K.S.A. 60-444 *is occurrences within the jury room that have a material bearing on the validity of the verdict.* See Concannon, *Impeaching Civil Verdicts: Juror Statements as Prejudicial Misconduct*, 52 J.B.A.K. 201, 210-12 (1983); *Cornejo v. Probst*, 6 Kan. App. 2d 529, 630 P.2d 1202, *rev. denied* 230 Kan. 817 (1981). In the *Cornejo* case the Court of Appeals was faced with two questions:

(1) Should the trial judge have granted defendant's request for a recall of the jury panel?
(2) Can the jury verdict be impeached on a showing that the jury considered income tax and attorney fees during its deliberations?

Although the issues there addressed are similar to those in the instant case, the facts here are dramatically different. Here the

record contained sufficient information, in proper form, to require the trial court to act upon the defendant's request for assistance in developing the record.

Kansas courts have adopted the rule that the jury is not to be instructed that the damages awarded are not subject to state or federal income taxes. *Spencer v. Eby Construction Co.*, 186 Kan. 345, 350 P.2d 18 (1960); *Rediker v. Chicago, Rock Island & Pacific Rld. Co.*, 1 Kan. App. 2d 581, 571 P.2d 70, *rev. denied* 225 Kan. 845 (1977).

In each instance, the court has commented that the incidence of taxation and its effect on the award is "not a proper factor to be considered by the jury in making an award of damages." In *Spencer* our court adopted, as one of the bases for its decision, the reasoning in *Briggs v. Chicago Great Western Ry Co.*, 248 Minn. 418, 80 N.W.2d 625 (1957):

" 'The fallacy of the contention that, if the instruction is not given the jury is likely to enhance the award by including an amount for income taxes, is based on the unjustified assumption:
" ' ". . .that the jury will not confine itself to the evidence nor the court's charge but will consider and take into account matters not mentioned therein. This is to assume that there will be misconduct on the part of the jury, an assumption in which we cannot indulge." *Missouri-Kansas-Texas R. Co. v. McFerrin* (Tex. Civ. App.) 279 S.W. (2d) 410, 419 [1955], reversed on other grounds, 156 Tex. 69, 291 S.W. (2d) 931 [1956].' " 186 Kan. at 351.

Since our court does not assume there will be misconduct on the part of the jury in the trial of a case, the only safeguard is to affirmatively show there was misconduct *after* the verdict is rendered. This can be accomplished only by a hearing on the motion for a new trial when the charge of misconduct is asserted as a ground for a new trial.

If the court abandons its obligation to test the jury for misconduct which occurs in the jury room, as here, then it must also abandon the rule asserted in *Spencer*, which at best indulges in a questionable presumption. Failure of the court to permit this questionable presumption to be rebutted is a clear indication of prejudice against the defendant in this case.

In my opinion, cases which require the giving of an instruction to the jury that state and federal income taxes are *not payable* on damage awards indicate the proper approach. The instruction informs the jury of a fact it should know and avoids speculation. The trend in recent cases is to allow such instructions. See 3

Minza, Nates, Kimball, Axelrod, Goldstein, Damages in Tort Actions § 17.14 (1984). Inherent in the court's rule, that it will not assume there will be misconduct on the part of the jury by taking tax consequences into consideration, is the corollary that if the jury does erroneously take tax consequences into consideration in calculating the damage award, *it is misconduct* which constitutes reversible error.

A provision of the Internal Revenue Code, mirrored by most state income tax statutes, excludes personal injury awards from gross income for the year in which the award would otherwise be subject to taxes. 26 U.S.C. § 104(a)(2) (1982). Specifically the exclusion embraces "the amount of damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." The "damages" must arise from the "prosecution of a legal suit or action based on tort or tort type rights" or "a settlement agreement entered into in lieu of such prosecution." 3 Minza, Nates, Kimball, Axelrod, Goldstein, § 17.13, pp. 17-46-7.

The statutory exclusion, standing alone,without an informative instruction to the jury clearly bestows a collateral source benefit upon a successful plaintiff in the amount of taxes that would otherwise be paid. A related concern, especially to defense counsel, is that juries will increase their awards to account for taxes they mistakenly assume plaintiffs will have to pay on those awards, thus resulting in double recovery for plaintiffs to the extent of the nonexistent taxes.

The danger of awards in excess of losses has led a number of courts to approve, or even to require, the issuance of a cautionary instruction as to the nontaxability of a personal injury award. The jury should be instructed "your award will not be subject to any income taxes to the plaintiff, and you should not consider such taxes in fixing the amount of your award." A cautionary instruction in this form would neither complicate a trial by making additional instructions necessary, nor would it prejudice either party. It would merely eliminate an area of doubt or speculation that might have improper impact on the computation of the amount of damages.

Cases holding such an instruction proper include: *Abele v. Massi*, 273 A.2d 260 (Del. 1970); *Bradshaw v. Rawlings*, 464 F. Supp. 175 (E.D. Pa. 1979); *DeBose v. Trapani*, 295 So.2d 72 (La.

App.), *writ denied* 299 So.2d 359 (La. 1974); *Dempsey v. Thompson*, 363 Mo. 339, 251 S.W.2d 42 (1952); *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284 (9th Cir [Or.] 1975); *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1249 (3d Cir. [Pa.]), *cert. denied* 404 U.S. 883 (1971).

As recently explained by the Supreme Court of the United States in *Norfolk & Western R. Co. v. Liepelt*, 444 U.S. 490, 62 L.Ed.2d 689, 100 S.Ct. 755 (1980): "[I]t is entirely possible that the . . . jury may assume that a plaintiff's recovery . . . will be subject to federal taxation, and that the award should be increased substantially in order to be sure that the injured party is fully compensated."

A well-written opinion holding it error for a trial court to refuse to instruct the jury that its award would not be taxed as income is *Dennis v. Blanchfield*, 48 Md. App. 325, 428 A.2d 80 (1981). The case is illustrative of the factual picture presented herein. There the court said:

"In support of his contention that the trial court erred in declining to give the tax instruction, Dr. Dennis relies principally upon *Norfolk and Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). In *Liepelt*, a wrongful death action brought under the Federal Employer's Liability Act (FELA), *see*, 45 U.S.C. § 51 et seq., in an Illinois court, the Supreme Court held that the state court erred in refusing to instruct the jury that any damages which they awarded would not be subject to taxation as income and that they should not consider such taxes in determining the amount to be awarded. 444 U.S. at 496-499, 100 S.Ct. at 759-60. The Court reasoned as follows:

" 'Section 104(a)(2) of the Internal Revenue Code provides that the amount of any damages received on account of personal injuries is not taxable income. The section is construed to apply to wrongful death awards; they are not taxable income to the recipient.

" 'Although the law is perfectly clear, it is entirely possible that the members of the jury may assume that a plaintiff's recovery in a case of this kind will be subject to federal taxation, and that the award should be increased substantially in order to be sure that the injured party is fully compensated. The Missouri Supreme Court expressed the opinion that "[i]t is reasonable to assume [that many] jurors [will] believe [that its verdict will] be subject to such taxes." *Dempsey v. Thompson*, 363 Mo. 339, 346, 251 S.W.2d 42, 45 (1952). And Judge Aldisert, writing for the Third Circuit, agreed:

" ' "We take judicial notice of the 'tax consciousness' of the American public. Yet, we also recognize, as did the court in *Dempsey v. Thompson*, 363 Mo. 339, 251 S.W.2d 42 (1952), that few members of the general public are aware of the special statutory exception for personal injury awards contained in the Internal Revenue Code.

" ' " '[T]here is always danger that today's tax-conscious juries may assume

(mistakenly of course) that the judgment will be taxable and therefore make their verdict big enough so that plaintiff would get what they think he deserves after the imaginary tax is taken out of it.'

" ' "II Harper & James, The Law of Torts § 25.12, at 1327-1328 (1956)," (Footnote omitted.) *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1251 (CA 3 1971), cert. denied, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165. " 'A number of other commentators have also identified that risk.

" 'In this case the respondents' expert witness computed the amount of pecuniary loss at $302,000, plus the value of the care and training that decedent would have provided to his young children; the jury awarded damages of $775,000. It is surely not fanciful to suppose that the jury erroneously believed that a large portion of the award would be payable to the Federal Government in taxes and that therefore it improperly inflated the recovery. Whether or not this speculation is accurate, we agree with petitioner that, as Judge Ely wrote for the Ninth Circuit,

" ' "To put the matter simply, giving the instruction can do no harm, and it can certainly help by preventing the jury from inflating the award and thus overcompensating the plaintiff on the basis of an erroneous assumption that the judgment will be taxable." *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 297 (CA 9 1975).' 444 U.S. at 496, 100 S. Ct. at 759." 48 Md. App. at 334-36.

Another area of misconduct by the jury asserted by counsel for the defendant was speculation concerning attorney fees. In my opinion, the trial court should have permitted counsel for the defendant to examine the jurors on this point to determine whether misconduct influenced the award.

Many of our cases emphasize, in denying motions for a new trial, that extraneous matters discussed by jurors were of common knowledge which they are entitled to consider. But matters of common knowledge must be factually correct and not involve extraneous calculations, or speculation and conjecture.

In *Verren v. City of Pittsburg*, 227 Kan. 259, 607 P.2d 36 (1980), the jury in a comparative negligence case was instructed on the elements of damage for which the plaintiff was entitled under the evidence to recover, and attorney fees was not among them. The Supreme Court ordered a hearing on the motion for a new trial based upon an affidavit, saying:

"Now, if we assume the truth of the affidavit, the jurors were guilty of misconduct in that they consciously disregarded the instructions of the court. They conspired together so as to circumvent the comparative negligence law. In total disregard of Instruction No. 7, they did consider the question of fault of plaintiff and increased the amount of actual damages to a fictitious figure which would result in giving the plaintiff the entire amount of his actual damage plus

attorney fees. No evidence was introduced on the amount of attorney fees and such an item would have to be mere speculation." 227 Kan. at 263.

In the instant case the assertion is made that the jury considered whether the damage award would be reduced by a percentage of attorney fees. No hearing was permitted by the trial court on the motion for a new trial to ascertain what transpired in the jury room. But what percentage could the jurors have had in mind—taking into consideration their common knowledge that attorney fees are payable out of an award?

Common knowledge throughout the legal profession in malpractice cases of this nature is that usually the attorney fee arrangement is 50% of recovery on a contingency fee basis. If this is what the jury considered, it is not only erroneous, but pure speculation.

Since 1976 attorney fees in malpractice actions of this nature are controlled by statute. In 1976, the legislature enacted L. 1976, ch. 248, § 1 which reads in part:

"Whenever a civil action is commenced by filing a petition or whenever a pleading shall state a claim in a district court for damages for personal injuries or death arising out of the rendering of or the failure to render professional services by any health care provider, *compensation for reasonable attorneys' fees to be paid by each litigant in the action shall be approved by the judge prior to final disposition of the case by the district court.* Compensation for reasonable attorneys' fees for services performed in an appeal of a judgment in any such action to the court of appeals shall be approved by the chief judge or by the presiding judge of the panel hearing the case.
Compensation for reasonable attorneys' fees for services performed in an appeal of a judgment in any such action to the supreme court shall be approved by the departmental justice for the department in which the appeal originated. In approving such compensation, the judge or justice shall examine the same and make such determination considering the nature and difficulty of the issues involved in the case and the time reasonably necessary to prepare and present the same." (Emphasis added.)

The foregoing enactment, K.S.A. 7-121b, has been the same since 1976. *Never* has a record come before the Supreme Court in a malpractice action indicating that this statute has been applied in making an allowance for attorney fees in the trial court, nor has any member of the Supreme Court made or been requested to make an allowance on appeal to the Supreme Court. Note, *Recent Legislation: The Kansas Approach to Medical Malpractice*, 16 Washburn L.J. 395, 416-17 (1977).

This statute is not a matter of common knowledge to members

of the Bar or the courts, much less to jurors. *It appears that it has been ignored.*

In my opinion, to avoid pure speculation on the part of jurors regarding attorney fees, the jury should be instructed on the provisions of this statute, and it must be applied and enforced by the courts as are other statutory provisions for the allowance of attorney fees. See *Wolf v. Mutual Benefit Health & Accident Association*, 188 Kan. 694, 366 P.2d 219 (1961); *In re Estate of Robinson*, 236 Kan. 431, 440, 690 P.2d 1383 (1984).

By reason of the foregoing trial court errors and speculation on the part of the jurors, the magnitude of the verdict in this case demonstrates *prejudice on its face.* In light of the evidence it shocks my conscience.

The plaintiff, Lillian K. Walters, at the time of trial had a life expectancy of 41.9 years. Her medical bills at the time of trial were approximately $59,000. She made no claim for lost-earning capacity, or diminished earning capacity; no evidence of future surgery or medical expenses was presented. The $2 million verdict included $1,940,000 in the general damage categories.

On an annual basis this gives the plaintiff the principal sum of $47,733 per year for the rest of her life. Assuming one-half of the damage award is paid on expenses and attorney fees, the remaining $1 million invested at 10% simple interest (present interest rates compounded quarterly on money invested in C.D.'s will exceed 10%), payable annually, will provide an annual income of $100,000 without invading the principal sum invested.

The law in Kansas regarding an excessive verdict has been well defined. One of our leading cases is *Kirk v. Beachner Construction Co., Inc.*, 214 Kan. 733, 522 P.2d 176 (1974). The rules there stated are confined to a situation which is based solely on the amount of the verdict. The case stands for the proposition that no verdict is right which more than compensates—and none is right which fails to compensate. The legal test is one of reasonable compensation.

In my opinion, courts of last resort must exercise a degree of economic judgment to provide stability in our free enterprise system if justice is to be administered fairly and within reason. Courts should not declare serious errors made by the trial court to be harmless, or permit a verdict permeated with speculation and conjecture to go unchallenged, particularly where the

amount of the verdict is clearly excessive on its face and indicates prejudice.

Many articles appearing in journals and periodicals address the crisis in the medical profession. The tremendous growth in malpractice liability has resulted in higher insurance premiums which insured physicians pass along in higher prices to health care consumers. In DeVito, *Abuse of Litigation: Plague of the Medical Profession*, 56 N.Y. St. B.J. 23, 25 (1984), the author says:

> "The jury system is a free society's precious gift to its citizens. The adversary system within which it functions is an effective guardian of our rights, but, as obtains in any free society, these rights carry with them commensurate obligations and responsibilities. This is especially true of lawyers who, in their capacity as officers of the court, have a unique duty to preserve, protect and perpetuate the founding spirit of our judicial process. Abuse of that process, whether in civil or criminal law, whether by the courts or by lawyers, is to guarantee its ultimate demise."

Other articles include *Medical Malpractice—Will Jumbo Awards Spark Another Insurance Crisis?*, 68 A.B.A.J. 1545 (1982); and Note, *Medical Malpractice Damage Awards: The Need for a Dual Approach*, 11 Fordham Urb. L.J. 973 (1983).

Where state courts of last resort fail to respond with reasonable action to fairly administer justice, public opinion shifts the control to legislative bodies. In the 1985 session of the Kansas Legislature, Senate Bill No. 110 has been introduced by the Judiciary Committee. The Bill is designed to limit liability in malpractice actions of this nature. In the Journal of the Kansas Trial Lawyers Association, Vol. VIII, No. 4, p. 25, this legislation is described as "extremely regressive." Similar instances where state courts of last resort have failed to act with reason have resulted in legislation introduced in the Congress of the United States. Carryover bills in the 99th Congress from the 98th Congress are bills concerning Federal Trade Commission regulation of the Bar, and federal preemption of product liability law of the states.

It is respectfully submitted this court should reverse the trial court and grant a new trial on the ground of misconduct of counsel for the plaintiff in closing argument and, failing this, that the court should remand the case for a hearing on the motion for new trial concerning the charge of misconduct on the part of the jury in fixing the damage award.